JOSEPH PORRECA AND JOSEPHINE PORRECA, PETITIONERS
v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 13858-83.          Filed April 28, 1986.

*Michael I. Saltzman*, *William T. Holloran*, and *Paul J.
Green*, for the petitioners.
*Laurence D. Ziegler* and *Rona Klein*, for the respondent.

SWIFT, *Judge*: In a statutory notice dated March 9, 1983,
respondent determined deficiencies in petitioners' Federal
income tax liabilities as follows:

| Year | Amount |
| --- | --- |
| 1979 | $61,617.33 |
| 1980 | 115,490.00 |
| 1981 | 30,738.82 |

The primary issues for decision are: (1) Whether petitioner
Joseph Porreca was at risk within the meaning of section
465[1] for the principal amount of promissory notes that were
labeled "recourse" liabilities and whether the conversion
feature of the promissory notes so immunized petitioner
from economic risk with respect thereto that there existed
an "other similar arrangement" within the meaning of
section 465(b)(4); and (2) whether petitioner's investments in

---

[1] All section references are to the Internal Revenue Code of 1954 as in effect during the
years in issue.

television programs were made with the intention of earning a profit within the meaning of section 183.

## FINDINGS OF FACT

Petitioners Joseph and Josephine Porreca are husband and wife and were residents of Belleville, New Jersey, at the time they filed their petition herein. Josephine Porreca is a party to this proceeding solely because she joined with her husband in filing joint Federal income tax returns for the years in issue. Hereinafter, references to "petitioner" refer to Joseph Porreca. This is a test case as to a number of other taxpayers who invested in television programs through Bravo Productions, Inc. (hereinafter referred to as Bravo).

Some of the facts have been stipulated by the parties and are so found. Petitioners timely filed their 1979, 1980, and 1981 Federal income tax returns utilizing the cash basis method of accounting. The present controversy arises from respondent's disallowance of deductions claimed on Schedule C of petitioners' Federal income tax returns for the years in issue with respect to petitioner's investments in two television programs purchased from Bravo. More specifically, petitioner purchased six one-half hour episodes of two television programs. Petitioner's ownership of the six episodes was represented by his ownership of the master videotapes thereof and of all rights to distribute, sell, and reproduce the videotapes. The specific deductions disallowed by respondent with respect to petitioner's investments are as follows:

|  | 1979 | 1980 | 1981 |
|---|---|---|---|
| Depreciation | $120,000 | $216,000 | $129,600 |
| Management fees | 750 | 975 | - - - |
| Interest | - - - | 8,400 | 18,000 |
| Other fees | - - - | 30 | 180 |

Throughout the years in issue, petitioner was a partner in a construction and consulting business known as Atlantic Construction Consultants. Prior to making the investment in the television programs in question herein, petitioner had made no investments in, nor did he have any business experience with the television industry or any other aspect of the entertainment business.

We will first describe the general manner by which Bravo financed the production of television programs and the specific terms of the investment involved herein followed by a description of the promotional documents given to investors. We will then describe the production and distribution associated with the Sports Scrapbook and Woman's Digest series of television programs produced by Bravo. Finally, we will describe some additional aspects of the investments made by petitioner and other investors in those television programs and of the collection efforts of Bravo with respect to investors who became delinquent with respect to amounts due under their promissory notes.

### Financing by Bravo of the Production of Television Programs, Terms of Petitioner's Investment, and the Promotional Documents

Bravo was incorporated in the State of Delaware in 1979 for the stated purpose of establishing an ongoing television production company whose production efforts would be directed primarily toward the cable television market. The three organizers and principal officers of Bravo were Lewis Sherman, Ronald Safier, and Peter Block. Lewis Sherman, the president of Bravo, had a diverse background in the entertainment business, including prior ownership of a Manhattan nightclub, production and promotion of concerts, and raising capital for a variety of entertainment-related businesses. Ronald Safier had prior experience in television production. Peter Block, a lawyer, had been the founder and managing partner of the Pittsburgh Penguins of the National Hockey League.

Bravo's business plan was to act as executive producer of television programs. In other words, Bravo would approve the concept for programs, arrange financing, hire line producers of programs, and handle administrative matters.

Instead of financing the production of television programs through limited partnerships that would own an entire series of a particular television program and that would maintain an ownership interest in all future episodes of the program, Bravo separately sold to investors for a fixed price each one-half hour episode of television programs it produced. Investors received the right to all net profits

earned from the sale or rental only of the particular episodes of the program they purchased.

Petitioner was asked in 1979 by Chester Moroze (Moroze), a salesman for Bravo, to invest in the television programs involved herein. Moroze had been referred to petitioner by petitioner's accountant, Harold Cohen. In 1979, petitioner purchased three one-half hour episodes of a television program produced by Bravo entitled "Sports Scrapbook." Two episodes were purchased by petitioner on November 19, 1979, and a third on December 4, 1979. The consideration specified in the purchase contracts or "Production Service Agreements" for each episode of Sports Scrapbook which petitioner purchased was $100,000. Of that amount, $10,000 in cash was paid by petitioner immediately upon execution of each agreement. The balance of the $100,000 purchase price for each episode was paid with a $90,000 promissory note executed by petitioner. Each promissory note was labeled "recourse," but it also provided that if petitioner made certain specified payments (and if none of the unlikely "events of default" specified in the contract occurred), petitioner had the option after 5 years to convert each promissory note from a recourse liability to a nonrecourse liability upon payment of $1,000 per note.

In 1980, petitioner purchased a total of three episodes of a television program produced by Bravo entitled "Woman's Digest." One episode was purchased on November 17, 1980, and two on December 19, 1980. The stated consideration for each episode of Woman's Digest purchased by petitioner was $120,000. Of that amount, $12,000 in cash was paid immediately upon execution of each agreement. The balance of the $120,000 purchase price for each episode was paid with a $108,000 promissory note executed by petitioner. Except for the difference in price and an interest rate stated in the promissory notes of 9 percent (as opposed to an interest rate of 7 percent stated in the promissory notes relating to the episodes in Sports Scrapbook), the terms of the promissory notes and other documents executed by petitioner and Bravo with respect to the purchase of the episodes of Woman's Digest were identical to those executed with respect to the purchase by petitioner of episodes of Sports Scrapbook.

The promissory notes given to Bravo by petitioner and by other investors in connection with their purchase of episodes of Woman's Digest and Sports Scrapbook also provided that the investors were required to make a minimum interest payment on or before January 10 of each of the first 5 years of the initial term of the promissory notes. The minimum interest payment required of petitioner in 1979 and in each of the following 4 years with respect to each of the promissory notes he signed when he purchased three episodes of Sports Scrapbook was $2,800. The minimum interest payment required of petitioner in 1980 and in each of the following 4 years with respect to each of the promissory notes he signed when he purchased three episodes of Woman's Digest was $3,200.

After making the annual minimum interest payments described in the prior paragraph, petitioner was not required, during the initial 5-year term of the promissory notes, to make any payments of accrued interest or principal on the promissory notes except as follows. During the first 3 years of the initial 5-year term of the promissory notes, net proceeds, if any,[2] received from distribution of each videotape were to be applied first to pay accrued interest and 45 percent of net proceeds remaining after payment of accrued interest were to be applied to principal due on the promissory note.

During the fourth and fifth year of the initial term of the promissory notes, net proceeds, if any, received from distribution of each videotape were to be applied first to accrued interest and second to principal on the promissory notes in an amount equal to the amount of tax depreciation claimed by the maker of the promissory notes in each of those years. Forty-five percent of the net proceeds received during the fourth and fifth year of the initial term of the promissory notes (and remaining after payment of accrued interest and after payment of the principal amount of the promissory notes relating to the amount of depreciation claimed) was to be applied to the principal amount due on the promissory notes.

If the minimum annual interest payments due during the

---

[2]The term "net proceeds" is not specifically defined in the promissory notes, in Bravo's offering documents, or elsewhere in the record herein.

initial 5-year term of the promissory notes had been paid by the maker of the promissory notes as of the end of the initial 5-year term, and if whatever accrued interest and principal that was due out of net proceeds were paid, the maker of the promissory notes could extend the term of the promissory notes for an additional 5 years (extension term). Thereafter, at any time during the extension term of the promissory notes, the maker could convert his liabilities thereunder from recourse to nonrecourse by paying Bravo $1,000. If the promissory notes were converted to nonrecourse, the maker no longer had to make the minimum accrued interest payments and the only source to which Bravo could look for payment of principal and interest on the promissory notes was the net proceeds from distribution of each videotape.

Under the production service agreement, Bravo had the right to accelerate the promissory notes and to declare the principal amount thereof immediately due and payable in the event the investor committed an act of default. Acts of default were described as the failure to make a minimum annual interest payment or the failure to correct material misrepresentations within 10 days of written notice from Bravo. The only significant representation made by each investor in the production service agreement was that the investor was not in default under any loan or credit agreement and that there was no litigation pending against the investor that might interfere with the performance of his liabilities under the promissory note.

After a brief description of the three principal officers of Bravo and after listing television programs previously produced by Bravo, the offering memorandum given to investors sets forth a number of schedules which highlight the tax sheltering advantages of the investments solicited. For example, the following schedule appeared in the 1980 offering memorandum:

## SCHEDULE A CHART

PROJECTIONS BASED UPON:
(1) Double declining depreciation
(2) Gross sale $120,000
(3) Five-year life
(4) $12,000 Downpayment
(5) $108,000 5-Year recourse note

|  | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| Year | Down-payment | Depreciation | Interest | Income sheltered | Ratio of income sheltered |
| | | *Initital period* | | | |
| 1 | $12,000 | $48,000 | 0 | $48,000 | 4.0 |
| 2 | 0 | 28,800 | $3,200 | 32,000 | 10.0 |
| 3 | 0 | 17,280 | 3,200 | 20,480 | 6.4 |
| 4 | 0 | 12,960 | 3,200 | 16,160 | 5.1 |
| 5 | 0 | 12,960 | 3,200 | 16,160 | 5.1 |
| | | *Extension period*[1] | | | |
| 6 | 0 | 0 | 3,200 | 3,200 | 1.0 |
| 7 | 0 | 0 | 3,200 | 3,200 | 1.0 |
| 8 | 0 | 0 | 3,200 | 3,200 | 1.0 |
| 9 | 0 | 0 | 3,200 | 3,200 | 1.0 |
| 10 | 0 | 0 | 3,200 | 3,200 | 1.0 |

[1]Upon payment of $1,000 principal during any calendar year of the extension term the note may be converted to nonrecource.

Variations of the above schedule were set forth in the offering memorandum assuming 4-year, 6-year, and 7-year useful lives for the master videotape of each program. The offering documents did not include an appraisal of the television programs, nor did they contain an estimate of projected income or gross receipts that might be realized therefrom or from investments therein.

The offering memorandum summarized and highlighted the important features of the promissory notes each investor would execute as follows:

In summary: the promissory note including both the Initial Term and the Extension Term are as follows:

1. Bravo has recourse to the owner during the Initial Term in the event of default.

2. However, there can be no default as long as the minimum payments of $2,800[3] are made.

3. At the end of five years if there should remain an unpaid balance still owing to Bravo, the owner may elect to extend the promissory note for an additional five years during which and at the end of which there shall be no recourse to the owner in the event of default (if the owner has converted to non-recourse during the extension period).

Each production service agreement provided for the production and delivery of a master videotape of each episode of a television program within 45 days after an

---

[3]Minimum payments required in the 1980 offering were $3,200.

agreement was signed by the investor. Each episode was to be approximately 30 minutes in duration. The master videotape was to be fully edited and ready in all respects for broadcast on television and other media. Under the production service agreement, Bravo retained the right to all ancillary, nontelevision marketing of the videotapes, and Bravo was to arrange for storage of the videotapes at the investor's expense. Once a particular episode was produced by Bravo, or by a line producer hired by Bravo, each investor had the right to hire any management service company to market and distribute that particular episode. Each investor gave Bravo a security interest in each master videotape pursuant to New York law.

*Sports Scrapbook*

The idea for the Sports Scrapbook series of television programs was originated by Chip Cipolla (Cipolla), a sports broadcaster and commentator. He had been an announcer for the New York Giants football team, the Mets baseball team, and the Cosmos soccer team. In 1979, Cipolla approached Lewis Sherman (Sherman), the president of Bravo, with the idea for a television program based on major events in sports history. The program would use a talk show format with interviews of athletes and film clips of particular events. Sherman believed that there was a large demand for sports programming and that the program would appeal to all age groups. He agreed on behalf of Bravo to produce 78 episodes of such a television program to be called Sports Scrapbook.

Bravo entered into an agreement for the use of studio and related services of Video Software & Production Center, Inc. (VSP) for filming Sports Scrapbook. Pursuant to a contract between Bravo and VSP, dated November 21, 1979, VSP agreed to provide 6 days of location shooting, 8 days of studio shooting, lighting, directorial services, editing, and other related services for production of the entire series. The total charge for use of VSP's studio and for its services was $87,975.25.

Bravo entered into an agreement with Baffin Productions, Inc. (Baffin) in December of 1979, in which Baffin agreed to be the line producer of Sports Scrapbook. The line producer

was responsible for all production services and equipment, film clips, tape stock and, except as noted below, acting talent and personnel associated with production of the program. Baffin agreed to produce and furnish Bravo all 78 episodes of Sports Scrapbook. Bravo agreed to pay Baffin $3,300 per episode for its services. In addition to the foregoing, Bravo agreed to pay W.F. Sports Enterprise, Inc., a total of $30,200 to act as the talent agent and to find entertainers and athletes to appear on Sports Scrapbook.

All 78 episodes of Sports Scrapbook were produced by June of 1980. Each episode opens with a montage of newspaper headlines pertaining to sports events and famous athletes. Each episode has the same set. Each episode uses a talk show format, with Cipolla interviewing the athletes. During some of the interviews, there are film clips of portions of sports events in which the athletes participated. Some of the athletes featured are Hank Aaron, Mickey Mantle, Bobby Thompson, and Jersey Joe Walcott. In connection with the interview of Bobby Thompson, for example, a film clip shows Thompson's pennant-winning home run in the 1951 National League playoffs.

Investors who purchased episodes of Sports Scrapbook were not required to contract with any particular management company for marketing the particular episodes of the program they owned. One management company, however (namely, Investors Management Services (IMS)), was recommended by Bravo to the investors, and all of the investors in Sports Scrapbook selected that management company. IMS charged petitioner herein for managing his three episodes of Sports Scrapbook an initial retainer fee of $750, an annual fee of $10 per tape, plus 6 percent of the gross receipts received from distribution of videotapes of the three episodes. The contract with IMS was for 5 years. IMS agreed to advise and consult with petitioner regarding distribution and marketing of the videotapes, to negotiate for and to select a distributor, and to collect all receipts in connection with the three episodes.

As a result of its selection by all of the investors in the 78 episodes of Sports Scrapbook, IMS had the right to select a distributor for the entire Sports Scrapbook series. On

January 7, 1980, IMS entered into an agreement with Television Syndicated Group, Inc. (TSG), for its services in distributing videotapes of Sports Scrapbook throughout the world for 5 years. TSG was engaged in the television programming distribution business. Under that agreement, TSG was entitled to receive 50 percent of the gross receipts generated from Sports Scrapbook. TSG entered into a co-distribution agreement with Janus Television, the television distribution company for Janus films and a well-known distributor of feature films for television and movie theatres. Under the Janus co-distribution agreement, which covered only 39 of the episodes of Sports Scrapbook, TSG would receive 70 percent of the net distribution fees and Janus would receive 30 percent thereof.

In attempting to sell and distribute episodes of Sports Scrapbook, TSG exhibited videotapes thereof at several conventions for television executives, including the National Association of Television Producers and Executives (NATPE) held in San Francisco in February of 1980. NATPE is a major convention that is held annually and is attended by television program planners, program managers, station managers, and television executives who make recommendations and decisions as to which new television programs should be purchased. TSG advertised the Sports Scrapbook series in advance of the convention, using the Janus name because it was more recognizable. TSG followed up on leads obtained at the convention. The sales force of TSG wrote letters to cable television stations throughout the country and made presentations to approximately 12 advertisers in an attempt to develop interest in Sports Scrapbook.

The distribution efforts described above were, for the most part, unsuccessful. A few episodes of Sports Scrapbook were shown on the Madison Square Garden Productions network. None of the three episodes purchased by petitioner, however, has ever been shown on television, and no income or receipts have been generated by petitioner's three episodes of Sports Scrapbook.

*Woman's Digest*

The idea for the Woman's Digest series of television programs was originated by Mort Zimmerman (Zimmer-

man). The program centered around Virginia Graham, a well-known television personality and author whom Zimmerman had known for 30 years. The program used a talk show format and was to feature guests who would be appealing to working women. Previous television shows starring Virginia Graham had included "Girl Talk," which ran on network television for 6 years, and "The Virginia Graham Show." Zimmerman believed that Virginia Graham's participation would contribute to a successful program. Zimmerman has been involved in the production of over 40 television programs.

On October 1, 1980, Zimmerman, on behalf of his controlled corporation, General Entertainments, Inc. (General Entertainments), entered into an agreement with Bravo for General Entertainments to act as line producer of Woman's Digest. General Entertainments provided all of the production services and equipment, talent, personnel, sets, and tape and film clips related to each episode of Woman's Digest. Bravo paid General Entertainments $5,500 for each episode. Bravo was to have copyright rights to each of the first 39 episodes of Woman's Digest, but General Entertainments had the right to produce additional episodes of the show, independently of Bravo and independently of the investors who had purchased the first 39 episodes.

On October 27, 1980, General Entertainments contracted with Virginia Graham for her to host Woman's Digest. Under that agreement, Miss Graham received $540 per episode and agreed to appear for a minimum of 39 episodes. For actual filming of Woman's Digest, General Entertainments contracted for use of the facilities of International Production Center (IPC), a modern television studio in New York City which is occasionally used in the production of network television shows.

The individual hired by General Entertainments to act as director of the Woman's Digest series was Don Horan, who has directed the Mike Wallace talk show and other television programs. The individual in charge of production was Monty Morgan, who had produced Virginia Graham's previous television shows, in addition to the Jack Parr Tonight Show and other television programs.

Under the agreement with Bravo, General Entertainments produced 39 episodes of Woman's Digest. Each episode was approximately 24 minutes in duration. The entire program was shot in 8 production days, from October 28, 1980, to December 16, 1980. Five episodes were produced each 18-hour production day. Horan supervised the lighting, camera angles, and staging and gave cues to Miss Graham. Morgan selected the guests, pre-interviewed them, and devised a general line of questioning for Miss Graham to follow for each guest.

Examples of guests appearing on Woman's Digest include Christie Brinkley, discussing her careers as a model and a sports photographer, and Ruth Warrick, an actress in the soap opera "All My Children," discussing the life of an actress in a long-running soap opera. None of the guests was paid for an appearance on Woman's Digest.

Similar to the sale of episodes of Sports Scrapbook, Bravo sold each episode of Woman's Digest separately to investors. Each investor was entitled to select any management company the investor desired. As was the case with episodes of Sports Scrapbook, however, all of the investors selected IMS to manage their episodes of Woman's Digest. IMS, therefore, acquired the right to manage and select a distributor for all 39 episodes of Woman's Digest.

On February 19, 1981, IMS entered into an agreement with Television Program Concepts, Inc. (TPC), for it to act as distributor of Woman's Digest. TPC was a subsidiary of General Entertainments. The distribution agreement gave TPC the exclusive worldwide rights to distribute the 39 episodes of Woman's Digest for a 5-year period, with an option of renewal for another 5 years at TPC's discretion. Under the agreement, TPC would receive a distribution fee of 70 percent of the gross receipts (not including receipts from the sale of videocassettes) derived from distribution of Woman's Digest within the United States and Canada and 50 percent of gross receipts (including receipts from the sale of videocassettes) derived from distribution thereof outside the United States and Canada.

Zimmerman, on behalf of TPC, wrote various letters in 1981 and 1982 to television stations throughout the United States in an effort to market Woman's Digest. He sent

demonstration videotapes to television stations, and he advertised Woman's Digest in a number of industry publications.

Zimmerman also approached a number of advertising agencies with the idea of bartering the program to television stations in exchange for advertising time. Under this arrangement, the program would be offered to television stations without charge and the advertising agencies would pay a fee to TPC for the advertising time it received from the television stations. In October of 1981, Cunningham & Walsh, a major advertising agency, agreed to attempt to barter the program to television stations in conjunction with advertising for one of its clients, Sterling Drugs. The talk show format and content of Woman's Digest was considered compatible with advertising spots developed for Sterling Drugs. Under the agreement between TPC and Cunningham & Walsh relating to the distribution of Woman's Digest and advertising for Sterling Drugs, Miss Graham agreed to undertake promotional activities such as attending talk shows, conventions, press conferences, and photography sessions.

Cunningham & Walsh made videotapes of Woman's Digest available to a number of television stations across the United States under the barter arrangement. Twenty-one stations showed the 39 episodes of Woman's Digest and in exchange therefor they gave Cunningham & Walsh advertising time on their stations to advertise products of Sterling Drugs. For the use of Woman's Digest in advertising the products of Sterling Drugs, Cunningham & Walsh actually paid to TPC a total of approximately $68,000.

Total gross receipts received with respect to each of petitioner's three episodes in Woman's Digest as of December 31, 1982, was $1,692.30. From that amount, distribution fees of $1,184.61 and management expenses of $30.46 per episode were subtracted, leaving net income to petitioner of $477.23 per episode.

### Additional Aspects of Petitioner's Investment and the Collection Efforts of Bravo

Petitioner, as previously mentioned, was engaged in the construction and consulting business. He had no back-

ground in television or entertainment-related businesses. In making the decision to invest in Sports Scrapbook and Woman's Digest, petitioner relied heavily on the advice of his accountant and his business partner. Both of these individuals were investing in television programs through Bravo, and petitioner was aware of their investments in relying on their advice to invest in similar programs.

Petitioner did not view any of the episodes of Sports Scrapbook or Woman's Digest prior to making his investments even though some of the episodes of Sports Scrapbook were available for viewing prior to his first purchase in 1979. He did not obtain an independent appraisal of Sports Scrapbook or Woman's Digest, nor did he consult anyone with expertise in television programming. He did review the tax advantages of the investment with his accountant, and he discussed the investment in general terms with his business partner. Petitioner had made investments in the past on the advice of his business partner, including investments in stocks, oil, and real estate.

At the time he purchased three episodes of Sports Scrapbook in 1979 and three episodes of Woman's Digest in 1980, petitioner made the required cash down payment of $10,000 (for each episode of Sports Scrapbook) and $12,000 (for each episode of Woman's Digest). Petitioner periodically became delinquent in his annual minimum interest payments liabilities to Bravo, beginning with the payment due on January 10, 1981. On September 27, 1982, petitioner executed a "demand note" to Bravo in which he promised to pay Bravo the $10,000 he was then in arrears with respect to the delinquent annual minimum interest payments.

On January 31, 1983, Bravo's attorneys sent a letter to petitioner advising him that he was in default with respect to his 1980 promissory notes in the total principal amount of $108,000 each, that Bravo was accelerating payment of the entire indebtedness, both principal and interest, and that $367,400 was presently due and owing. By letter dated March 31, 1983, however, Bravo's attorneys advised petitioner that Bravo had a claim against petitioner in the amount of only $23,000, and that all legal action would be

suspended until April 11, 1983, on the condition that petitioner make a partial payment of $5,000.

Petitioner has never been sued by Bravo, either to collect the balance due on the promissory notes or to recover the master videotapes from petitioner pursuant to the security agreements. On January 29, 1984, Bravo sent petitioner a form letter offering him the right to convert the promissory notes executed in 1979 from recourse to nonrecourse.

Approximately 50 percent of the investors in Sports Scrapbook and Woman's Digest became delinquent with respect to the minimum annual interest payments due on their promissory notes to Bravo. At the time of the trial herein, Bravo had instituted lawsuits against four of the investors.[4] At the time of trial herein, three of the lawsuits were still pending and one, which had sought recovery for unpaid principal and interest on promissory notes of $584,000, was settled for $30,000.

OPINION

*At-Risk Issue*

The first issue for decision is whether petitioner properly may be considered at risk within the meaning of section 465 with respect to the principal amount of the promissory notes he gave to Bravo for his purchase of three episodes of Sports Scrapbook and three episodes of Woman's Digest. The resolution of this issue will limit the extent to which petitioner may deduct losses relating to his investment.

Petitioner asserts that he was at risk with respect to the promissory notes because the promissory notes expressly provided for his recourse liability with respect thereto at the end of each of the years involved herein. Petitioner asserts that his right in 1984 and later years to convert his liability under the promissory notes from recourse to nonrecourse has no effect upon the recourse nature of the promissory notes in 1979, 1980, and 1981.

Respondent asserts that even prior to the time petitioner had the right to convert his promissory notes, petitioner

---

[4]According to the officers of Bravo, additional lawsuits against delinquent investors were not instituted because Bravo did not have the financial resources to defend against anticipated counterclaims for securities law violations.

should not be considered at risk with respect to his liabilities thereunder because the promissory notes, although labeled "recourse," were never intended as such by the parties. Respondent argues that petitioner's liabilities under the promissory notes during their initial 5-year "recourse" term were so insignificant and the restrictions upon petitioner's right to exercise the conversion privilege were so limited that the promissory notes must be regarded as nonrecourse from the day the promissory notes were signed by petitioner. Respondent, therefore, concludes that petitioner's liabilities under the promissory notes must be regarded nonrecourse or as being covered by a guarantee, stop-loss agreement, or other similar arrangement under section 465(b)(4). For the following reasons, we agree with respondent.

Section 465, among other things, provides that where an individual invests in motion picture films or television videotapes, any loss from the investment for a taxable year shall be allowed only to the extent the taxpayer is at risk with respect to the activity at the close of the taxable year. Sec. 465(a)(1); sec. 465(c)(1)(A).

Included in the amount for which a taxpayer is considered at risk are amounts of cash contributed by the taxpayer and amounts borrowed with respect to the activity. Sec. 465(b)(1). For a taxpayer to be considered at risk with respect to borrowed amounts, however, the taxpayer must be personally liable for repayment of the borrowed amounts or have pledged property, other than property used in the activity, as security for the borrowed amounts. Sec. 465(b)(2). In the instant case, no unrelated property was pledged by petitioner as security for the borrowed amounts. Petitioner, therefore, will be considered at risk with respect to the promissory notes only if he was genuinely personally liable for payment of the amounts due thereunder.

Section 465(b)(4) provides as follows:

(b) AMOUNTS CONSIDERED AT RISK.—

\* \* \* \* \* \* \*

(4) EXCEPTION.—Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through *nonrecourse financing*, guarantees, stop loss agreements, or *other similar arrangements*. [Emphasis added.]

Section 465 was enacted by Congress as part of the Tax Reform Act of 1976 (Pub. L. 94-455, 90 Stat. 1531). The purpose of the section was to counteract the perceived abuse of tax benefits arising from the use of nonrecourse financing following the Supreme Court's decision in *Crane v. Commissioner*, 331 U.S. 1 (1974).[5] The Senate Finance Committee report explained the purpose of enacting section 465 as follows:

When an investor is solicited for a tax shelter activity, it has become common practice to promise the prospective investor substantial tax losses which can be used to decrease the tax on his income from other sources. The committee believes that it is not equitable to allow these individual investors to defer tax on income from other sources through losses generated by tax sheltering activities, to the extent the losses exceed the amount of actual investment the taxpayer has placed at risk in the transaction.

The opportunity to deduct tax losses in excess of the amount of the taxpayer's economic risk arises under present law primarily through the use of nonrecourse financing not only by limited partnerships, but also by individuals and subchapter S corporations. The ability to deduct tax losses in excess of economic risk also may arise through guarantees, stop-loss agreements, guaranteed repurchase agreements, *and other devices* used by partnerships, individuals and subchapter S corporations. [S. Rept. 94-938, at 47 (1976), 1976-3 C.B. (Vol. 3) 49, 85. Emphasis added.]

The legislative history of section 465 also contains several references to situations where a recourse liability can be converted to a nonrecourse liability upon the happening of subsequent events. The Senate Finance Committee report contains the following statement:

If the partners in a partnership are personally liable on a loan to the partnership at the time the loan is initially made, but if the loan provides that the debt becomes nonrecourse if certain later events occur (e.g., if an orchard reaches a certain stage of development), the partners are exposed to the risk of loss during the period they are personally liable on the loan. * * * [S. Rept. 94-938, at 48 (1976), 1976-3 C.B. (Vol. 3) 49, 86 n. 1.]

Similarly, the House Ways and Means Committee report on section 465 contains the following statement:

---

[5]In *Crane v. Commissioner*, 331 U.S. 1 (1974), the Supreme Court held that when property encumbered by a nonrecourse debt not exceeding fair market value is disposed of, the amount realized includes the nonrecourse indebtedness. In *Commissioner v. Tufts*, 461 U.S. 300 (1983), this rule was extended to include nonrecourse liability exceeding the fair market value of the property.

If the partners in a partnership are personally liable on a loan to the partnership at the time the loan is initially made, but if the loan provides that the debt becomes nonrecourse if certain later events occur, (e.g., if a motion picture reaches a certain stage of completion or generates a certain level of box office receipts), the partners are exposed to the risk of loss during the period they are personally liable on the loan. They cease to be exposed to loss from and after the time that the loan becomes nonrecourse. [H. Rept. 94-658, at 110 (1976), 1976-3 C.B. (Vol. 2) 701, 802 n. 10.]

Both of the foregoing footnotes occur after statements indicating that the at-risk limitation "is to apply on the basis of the facts existing at the end of each taxable year." [S. Rept. 94-938, *supra*, 1976-3 C.B. (Vol. 3) at 86; H. Rept. 94-658, *supra*, 1976-3 C.B. (Vol. 2) at 802.]

Although the legislative history of section 465 does not define specifically what is meant by the words "other similar arrangements," it does evidence concern with situations in which taxpayers are effectively immunized from any realistic possibility of suffering an economic loss even though the underlying transaction was not profitable. Those situations include nonrecourse financing, various insurance agreements, stop-loss arrangements, and partnership agreements in which the partnership agrees to buy back the investor's limited partnership interest. The Senate Finance Committee report explains as follows:

Also, under these rules, a taxpayer's capital is not "at risk" in the business, even as to the equity capital which he has contributed to the extent he is protected against economic loss of all or part of such capital by reason of an agreement or arrangement for compensation or reimbursement to him of any loss which he may suffer. Under this concept, an investor is not "at risk" if he arranges to receive insurance or other compensation for an economic loss after the loss is sustained, or if he is entitled to reimbursement for part or all of any loss by reason of a binding agreement between himself and another person. [S. Rept. 94-938, at 49 (1976), 1976-3 C.B. (Vol. 3) 49, 87; fn. ref. omitted.]

No final treasury regulations have been promulgated with respect to section 465. Temporary regulations were issued on August 19, 1977, which addressed certain problems relating to investments made prior to the effective date of section 465. T.D. 7504, 1977-2 C.B. 180.[6]

---

[6]Proposed regulations were published in the Federal Register on June 5, 1979. 44 Fed. Reg. 32235 (1979). Sec. 1.465-1(b), Proposed Income Tax Regs., states in part, as follows:

In a recent opinion, we addressed the "other similar arrangement" language of section 465(b)(4). In *Capek v. Commissioner*, 86 T.C. 14 (1986), investors in a coal mining program issued promissory notes in connection with their liabilities to make advance royalty payments that on their face were recourse as to the investors. The investors, however, also were entitled to receive "penalty" payments if coal was not mined. The amounts to be paid the investors under the penalty provision contained in the mining contracts coincided closely with amounts due from investors under their promissory notes. We held that the effect of the right to receive the penalty payments was to "protect investors from ever being required to satisfy the loans" (86 T.C. at 50), and that the penalty provision constituted a guarantee or "other similar arrangement" under section 465(b)(4).

We conclude, based upon the facts and circumstances before us, that petitioner herein was so effectively immunized from economic loss during the years 1979, 1980, and 1981, with respect to the promissory notes he issued to Bravo that his liabilities thereunder to make payments of principal, for Federal tax purposes, are to be regarded as nonrecourse liabilities and that there existed with respect thereto an "other similar arrangement" within the meaning

---

(b) *Substance over form.* In applying section 465 and these regulations, substance will prevail over form. Regardless of the form a transaction may take, the taxpayer's amount at risk will not be increased if the transaction is inconsistent with normal commercial practices or is, in essence, a device to avoid section 465. * * *

Sec. 1.465-5, Proposed Income Tax Regs., specifically addresses the treatment of debts that can be converted from recourse to nonrecourse liabilities. It provides as follows:

Sec. 1.465-5. General rules; recourse liabilities which become nonrecourse upon the occurrence of an event. In the case of liabilities which are recourse for a period of time and then after the occurrence of an event or lapse of a period of time become nonrecourse, a taxpayer shall be considered at risk during the period of recourse liability if—

(a) On the basis of all the facts and circumstances, the reasons for entering into such a borrowing arrangement are primarily business motivated and not primarily related to Federal income tax consequences; and

(b) Such a borrowing arrangement is consistent with the normal commercial practice of financing the activity for which the money is being borrowed.

In addition, sec. 1.465-6, Proposed Income Tax Regs., provides in pertinent part:

(a) *In general.* Notwithstanding any other provision in any regulation under section 465, assets of a taxpayer (including money) contributed to an activity shall not be treated as increasing the taxpayer's amount at risk to the extent the taxpayer is protected against loss of such assets. In addition, amounts borrowed by a taxpayer shall not be considered at risk to the extent the taxpayer is protected against loss of the borrowed amount. Similarly, such amounts shall not be considered at risk if the taxpayer is protected against loss of the property pledged as security and the taxpayer is not personally liable for repayment.

of section 465(b)(4). The facts that lead us to this conclusion are the combination of the following: (1) During the initial 5-year term, the payments required of petitioner to keep petitioner current on the promissory notes were minimal;[7] (2) amounts of principal and interest in excess of the annual minimum interest payments to be paid on the promissory notes during the initial 5-year term were dependent solely on net proceeds received from distribution of the videotapes; (3) the unilateral right of petitioner to convert the promissory notes to nonrecourse liabilities merely upon the passage of 5 years and the payment of $1,000 per note; and (4) the right of petitioner, even though he had become delinquent with respect to annual minimum interest payments during the initial 5-year term of the promissory notes, to make up delinquencies at the end of the 5-year term and then to convert the promissory notes to nonrecourse liabilities by the payment of a nominal conversion fee.

The actions of Bravo with respect to delinquencies on the promissory notes of investors in Sports Scrapbook and Woman's Digest support our conclusion that the investors were not subject to any meaningful economic risk with respect to their liabilities under the promissory notes. Approximately 50 percent of the investors became delinquent with respect to the annual minimum payments during the initial 5-year term of the promissory notes. Bravo sued only four of the delinquent investors, and those lawsuits were instituted subsequent to the filing of the petition herein.

Petitioner refers to the legislative history of section 465(b), previously cited herein, and argues that Congress acknowledged therein that promissory notes initially could be recourse as to the maker even though the maker later had the right to convert the promissory notes to nonrecourse liabilities. Implicit in each of the examples set forth in the legislative history (namely, an orchard reaching a certain stage of development and a motion picture reaching a certain stage of completion or generating a

---

[7]Although the payments required each year by petitioner with respect to each of the promissory notes ($2,800 with respect to the notes issued in 1979 and $3,200 with respect to the notes issued in 1980) may be substantial in another context, in the context of this case they are insignificant.

certain level of box office receipts) was an event that had a substantial economic relationship to the activity which triggered the conversion of the promissory notes from recourse to nonrecourse liabilities. In the instant case, there was no substantial economic event that triggered the investor's right to convert the promissory notes to nonrecourse liabilities. That right arose merely upon the passage of time, upon the elimination of any delinquencies in the annual minimum interest payments, and upon the payment of a nominal conversion fee.

In Rev. Rul. 81-283, 1981-2 C.B. 115, involving a fact situation similar to that involved herein, respondent took the position that where a recourse promissory note could be converted by the investor to a nonrecourse liability, the promissory note would be recognized as a recourse liability prior to its conversion only if the conversion thereof was tied to a substantial economic event. We recognize that revenue rulings merely represent the position of respondent and do not constitute authority. *Stubbs, Overbeck & Associates v. United States*, 445 F.2d 1142, 1146-1147 (5th Cir. 1971). We agree, however, with respondent's position therein.[8]

Petitioner contends, in the alternative, that the conversion of the promissory notes in question herein was dependent upon substantial economic events. Petitioner argues that television programs typically prove their profitability in the first 5 years after initial distribution and therefore that petitioner's right to convert his promissory notes only after 5 years had lapsed was tied to a substantial economic event (namely, the period of time during which the two television programs likely would have proved their value or lack thereof). We disagree. To satisfy the substantial economic event requirement, the passage of a stated period of time must be coupled with some actual experience or events which demonstrate or establish some degree of economic viability or success of the underlying activity. Petitioner's promissory notes could be converted to nonrecourse liabilities after the lapse of 5 years regardless

---

[8]See also Rev. Rul. 82-225, 1982-2 C.B. 100, in which respondent took the position that an investor will not be considered at risk with respect to recourse promissory notes that may be converted to nonrecourse liabilities where the conversion is not tied to the value of the underlying security.

of whether a single dollar of income had been earned from Sports Scrapbook or Woman's Digest.

Petitioner also argues that with the enactment of the recapture provisions of section 465(e), as part of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2763, Congress implicitly acknowledged that recourse liabilities (such as those involved herein) would be recognized as such even though they can be converted to nonrecourse liabilities at some later point in time. As explained in the House report, section 465(e) provides that—

if the amount at risk is reduced below zero (by distributions to the taxpayer, by changes in the status of indebtedness from recourse to nonrecourse, by the commencement of a guarantee or other similar arrangement which affects the taxpayer's risk of loss, or otherwise), the taxpayer will recognize income to the extent that his at risk basis is reduced below zero. * * * [H. Rept. 95-1445, at 72, 1978-3 C.B. (Vol. 1) 181, 246-247.]

Petitioner is not benefited by the enactment of section 465(e). That provision applies only where the debtor genuinely was at risk during the stated recourse period, not to promissory notes such as those involved herein with respect to which the makers were never genuinely at risk.

Petitioner suggests that under one particular scenario he theoretically could have been held personally liable for all principal and interest due under the promissory notes he issued to Bravo. If petitioner failed to make minimum interest payments during the initial 5-year period of the promissory notes, Bravo could declare the full amount of the principal immediately due and payable and could sue petitioner for payment of the full principal and all accrued interest. As noted earlier, however, if during the pendency of any such lawsuit the initial 5-year term of the promissory notes lapsed, petitioner apparently at that time only would have to make up the deficiencies in his annual minimum interest payments, pay the $1,000 per note conversion fee, and he could walk away from the lawsuit and any further liabilities under the promissory notes.

Petitioner also suggests that if a judgment was entered against him in that hypothetical lawsuit before the initial 5-year term of the promissory notes lapsed, he could not avoid a judgment for the full principal and interest due

because, at that point in time, he would not have been able to convert the promissory notes to nonrecourse liabilities. In light of the small minimum payments required during the initial 5-year term of the promissory notes and the apparent intent of Bravo not to sue for collection of delinquent payments, such a scenario is highly unlikely and does not affect the conclusion we reach herein. We conclude that the parties to the promissory notes in question never intended petitioner to be personally liable for the face amount of the promissory notes. We reiterate that the minimal collection efforts of Bravo with respect to investors who did not make their annual minimum interest payments confirm our conclusion that the parties to the promissory notes did not intend genuine recourse liabilities to exist at any time.

For the reasons stated above, we conclude that petitioner was not at risk within the meaning of section 465 for the principal amount of the promissory notes which he issued to Bravo.

*Petitioner's Profit Motive*

Petitioner claims deductions for depreciation, management fees, and other fees paid in 1979, 1980, and 1981, with respect to his investment in Sports Scrapbook and Woman's Digest. Petitioner alleges that his investment and activities with respect thereto were entered into for the production of income. Respondent alleges that the primary purpose of petitioner's investment was to generate tax deductions and that petitioner did not enter into the investment for profit.

Deductions claimed for depreciation under section 167, and for management and other business expenses under section 162 or section 212 are allowed only if the expenses are incurred in connection with the taxpayer's trade or business or in connection with the production of income. Petitioner does not argue that he was in the trade or business of owning and distributing television programs, but he does argue that he invested in Sports Scrapbook and Woman's Digest for the production of income.

To prove that an investment was made for the production of income the taxpayer must establish that the investment

was entered into with the "actual and honest objective of making a profit." *Dreicer v. Commissioner*, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Although a reasonable expectation of profit is not required, the taxpayer's objective of making a profit must be bona fide. *Fox v. Commissioner*, 80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. *Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner*, 734 F.2d 5-7, 9 (3d Cir. 1984).

The issue as to whether an investment is made or an activity is undertaken with a profit objective is one of fact to be resolved on the basis of all the facts and circumstances. *Allen v. Commissioner*, 72 T.C. 28, 34 (1979); *Jasionowski v. Commissioner*, 66 T.C. 312, 319 (1976). Factors to be considered in making such a determination include: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer, and (9) elements of personal pleasure or recreation. Sec. 1.183-2(b), Income Tax Regs. In deciding this issue, greater weight is to be given to objective factors than to the taxpayer's mere statement of intent. *Siegel v. Commissioner*, 78 T.C. 659, 698 (1982).

Petitioner argues that he invested in Sports Scrapbook and Woman's Digest for profit and that the programs were professionally produced and distributed. Respondent denies these contentions and asserts that petitioner entered into the transactions primarily for tax benefits and that, given the structure of the transactions, petitioner had no reasonable objective for profit. For the following reasons, we agree with respondent.

Petitioner admits that he did not personally investigate

the merits of the investment. He argues, however, that it was reasonable for him to rely upon the advice of those who did have investment expertise and who did investigate the profit potential of the investment. See *Flowers v. Commissioner*, 80 T.C. 914, 932 (1983). Petitioner's accountant and his business partner, whose tax and investment advice petitioner did receive, had no prior experience or expertise in investing in television programs or in the entertainment business. Petitioner's discussion of the investment with his accountant dealt primarily with the tax advantages of the investment.

Prior to deciding to invest, petitioner did not seek the advice of anyone knowledgeable in the entertainment business. He did not obtain an independent appraisal of the value or marketability of Sports Scrapbook or Woman's Digest, nor did he obtain estimates of the potential income that could be generated from the videotapes. Petitioner did not know or inquire as to the amount of gross income that would be necessary in order for him to make a profit from the investment. He did not investigate the background of Bravo, other than to review a list of prior television productions of Bravo and a description of the three principal officers of Bravo that were set forth in Bravo's offering documents. Petitioner did not view any of Bravo's television programs prior to making his decision to invest. It is apparent to us that petitioner's investigation of the profit potential of investing in Sports Scrapbook and Woman's Digest was inadequate and evidenced little, if any, concern for the profit potential thereof.

Petitioner emphasizes that Bravo did hire professional line producers to produce Sports Scrapbook and Woman's Digest and that, when measured by standards applicable to cable television programming, the quality of production of Sports Scrapbook was at least average and the quality of production of Woman's Digest was above average. Petitioner also argues that the distribution efforts in connection with Sports Scrapbook and Woman's Digest were significant and professionally handled. Petitioner argues that the rapid expansion of cable television markets that was occurring in 1979 and 1980 provided a significant profit potential for his investments. The number of homes with

cable television was projected by experts to double within 5 years. The number of cable companies and cable channels was expanding rapidly, and major corporations (including broadcast networks such as ABC and CBS) were investing millions of dollars in cable services and cable networks.

Petitioner acknowledges the high risks that are associated with the production of television programs, but petitioner compares movies with television programs and cites *Bizub v. Commissioner*, T.C. Memo. 1983-280, in which we stated that—

the motion picture industry is a highly speculative business. Only a small percentage of the pictures produced ever make a profit. However, this does not necessarily imply that a film's purchase is not an activity engaged in for profit. * * * [46 T.C.M. 199, at 209, 52 P-H Memo T.C. par. 83,280, at 83-1158.]

In spite of the expansion occurring in the cable television industry and in spite of the production and distribution efforts associated with Sports Scrapbook and Woman's Digest, under the structure of the particular transactions involved herein, it was extremely unlikely that petitioner would make any profit from his investment. Petitioner's own experts testified that, under their projections, the gross receipts likely to be earned from the realistically available sources for distribution of the programs were in the range of $135,000 to $175,000 for each episode of Sports Scrapbook and Woman's Digest. In order to make the payments required to distributors and the management company, however, and to pay off the promissory notes and to recoup petitioner's cash investment, each episode of Sports Scrapbook would have had to generate gross receipts of $212,765.95 and each episode of Woman's Digest would have had to generate gross receipts of $425,531.91, before petitioner even could begin to make a profit.

In referring to income projections of petitioner's experts, we do not adopt those projections as our own. We note that respondent's experts testified that individual, separate episodes of Sports Scrapbook and Woman's Digest had no economic value, and that, if each episode is valued as part of a series of a single television program, each episode had the potential to earn gross receipts of no more than $8,000,

and the maximum fair market value that could be ascribed to each episode was $4,000.

We do not find it necessary specifically to adopt the income projections or the opinions as to value of the experts of petitioner or of respondent. Videotapes of the three episodes of Sports Scrapbook and Woman's Digest purchased by petitioner were introduced into evidence and have been viewed by the Court. We agree with respondent's experts that the content of the programs was poor and unappealing. We are not surprised by their inability to generate any significant interest in the television community. The content of the programs, the structure of the financing (as described in detail herein), and the amount of fees to be paid to others indicate to us that the investment in question was not intended to produce a profit for petitioner. This conclusion is supported by petitioner's superficial investigation of the investment and the activities of Bravo with respect to delinquencies on the promissory notes. The fact that some efforts were made to distribute the programs does not overcome the other factors that establish the lack of a legitimate, good-faith profit motive.

We conclude that petitioner's investment in Sports Scrapbook and Woman's Digest was not made for profit within the meaning of section 183.

*Amounts Paid as Interest*

Petitioner contends on brief that if we conclude, as we have, that petitioner's liabilities under the promissory notes to Bravo are not to be treated as amounts with respect to which petitioner was at risk under section 465, amounts which petitioner paid as interest during the initial 5-year term of the promissory notes should be treated as part of the purchase price for his investment. In light of this position, amounts paid by petitioner as interest during the initial 5-year term of the promissory notes are to be treated as capital expenditures of acquiring petitioner's interest in Sports Scrapbook and Woman's Digest.

*Decision will be entered for the respondent.*