ALFRED W. AND CONNIE N. RAGGHIANTI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ragghianti v. Commissioner
Docket No. 33135-84.
United States Tax Court
T.C. Memo 1988-125; 1988 Tax Ct. Memo LEXIS 152; 55 T.C.M. (CCH) 446; T.C.M. (RIA) 88125; March 23, 1988. Edsel F. Matthews, Jr., for the petitioners. Richard W. Kennedy, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, in a notice of deficiency dated June 7, 1984, determined deficiencies in petitioners' income taxes of $ 22,236.62 for taxable year 1978 and $ 3,808 for taxable year 1979. This action involves petitioners' purchase of a half-hour videotape in the series "Cosmic Frontiers." The issues *153 for our consideration are: (1) Whether petitioners purchased the videotape with the objective of making a profit; (2) whether the videotape existed and, if so, when it was placed in service; (3) whether "chameleon" notes used to purchase the videotape may be included in petitioners' basis; (4) whether petitioners were at risk with respect to the chameleon notes; and (5) whether "interest" paid in connection with the venture is deductible. FINDINGS OF FACT Petitioners resided in Gulf Breeze, Florida, when they filed their petition in this case. Petitioners timely filed their tax returns for the years at issue. The only issues in this case involve the television videotape. During and prior to the years at issue, Lloyd E. Percell (Percell) was the sole shareholder of a number of corporations, known as the "Executive Corporations." In the course of conversations between Percell and Glen Taylor, owner of Syntar Productions, Inc. (and its successor Solaris International Pictures), Taylor convinced Percell of the profit potential in the sale of television videotapes to Percell's executive clientele. Percell was also introduced to individuals that were interested in selling videotapes *154 to investors on behalf of Percell. These individuals had close connections to many investors in the Rocky Mountain area. Upon or shortly after commencement of the sales activities, Percell formed Executive Productions, Inc. (EPI), as the entity with whom the investors would contract for the videotapes and which would, in turn, contract with Syntar or Solaris for the videotapes. The tapes were marketed to investors. [1]
The same individuals that marketed the videotapes also represented that they had another corporation, International Communications Consultants (ICC), that would handle marketing and distribution of the videotapes for investors. As part of the sales presentation regarding the videotape, the salesman (Financial Advisor) made a verbal and visual presentation relative to the financial opportunities and tax shelter aspects of the videotape and provided the investor with a booklet entitled "Tax and Accounting Considerations Re: Acquisition of Motion Picture Films and Television Video Tapes," an attorney's opinion regarding the tax effects of investment in the tapes, and a copy of "Centerpoint" *155 newsletter for March 1977. The salesman would also use in his presentation a brochure with a cover entitled "Exeuctive Productions, Inc.," which contained information about Solaris, the available tapes, tax effects, and background information regarding the motion picture and television videotape industry, as well as a set of procedures to be followed in the sale of the videotapes. This information was all primarily tax-related, and did not include appraisals or any information concerning economic return. Investors would enter into a "Production Order" with EPI for a television videotape which contained a single, half-hour episode in a multi-episode series. The purchase price of each episode was $ 100,000. Required at the execution of the production order was the sum of $ 9,000 cash, $ 6,500 denominated as the "down payment" and $ 2,500 "prepaid interest." The terms used do not accurately describe the use of the money. The remainder of the purchase price was financed by a note for $ 93,500. The note bore interest at 7 percent and the "first term" of the note was for 7 years. During the first term, minimum interest payments of $ 2,000 per year were required. In addition, any *156 receipts from exploitation for the first 3 years were to be applied as follows: (1) 10 percent to owner; (2) accrued but unpaid interest, including the minimum $ 2,000 payment above; and (3) if any amounts remained, 45 percent would be applied toward the note principal. During the remaining 4 years receipts would be applied: (1) 10 percent to owner; (2) accrued but unpaid interest, including the minimum payment; and (3) if any amount remained, an amount equal to the depreciation taken by the owner in that year plus 45 percent of any remaining receipts toward note principal. At the end of the first term, the note could be extended and converted to nonrecourse upon payment of $ 1,000 principal amount per tape and the occurrence of one of three conditions. One of these conditions was already fulfilled in 1978. [2] The videotape was used as collateral for the note. No UCC-1s were filed [3] regarding the tapes. *157 Concurrent with the investor's signing of the production order, EPI would enter into a "Production Order-Subcontract" with Solaris to obtain the videotapes. The production order-subcontract was almost identical to the production order, except that it was nonrecourse. The original videotape was to be stored in a vault at Solaris and Solaris would issue a Vault Receipt to the investor. The investor would also enter into a "Management and Service Agreement" with ICC for the marketing of the videotape. At the conclusion of a presentation on November 3, 1978, petitioner signed a production order with EPI, ostensibly purchasing episode 9 in the series "Cosmic Frontiers." He also entered into a "Distribution Agreement" with ICC. [4]
Petitioner is a mobile home salesman. During 1978 petitioner was successful in his mobile home sales and was looking for investment opportunities. He has never seen the videotape he purchased. Petitioner has no background in the television or videotape industry *158 or related fields. He did not obtain any appraisals of the videotape, nor did he research the economics of the industry or analyze his expected return. Petitioner has not conducted any activity with respect to the videotape in addition to his initial purchase. Petitioner invested in EPI on the recommendation of a client's attorney, and because he was impressed with the colorful brochures. Petitioner's videotape was to be a part of a series of a 13 tape series about outer space. Dr. William Kaufman, who was to host the tapes, was described as an authority on space science. [5] There is a minimal or negligible market for such a program on commercial television; however, there may be a market in public television or classroom and other educational areas. The fair market of petitioner's episode and the entire series is nominal. [6] As of June 2, 1979, many of the EPI videotapes were not completed, including at least some of the "Cosmic Frontiers" series. Neither petitioner nor EPI received any funds from the distribution of the videotape. *159 On their return for 1978, petitioners claimed deductions of $ 28,000 for depreciation and a $ 7,788 investment tax credit concerning the video tape. In 1979 petitioners claimed deductions of $ 18,000 for depreciation and $ 2,500 for interest concerning the videotape. OPINION This case raises anew the merits of a so-called "tax shelter" investment. Petitioner bears the burden of establishing the property of the deductions and credits claimed. Welch v. Helvering,290 U.S. 111 (1930); Rule 142(a).[7]
The threshold issue is whether the videotape was purchased with the objective of making a profit. If not, deductions are limited to the income generated (here, zero), and no credits are allowed. Secs. 183, 38, 46. This Court and others have commented on the "profit objective" requirement in many "tax shelter" cases. A representative sample of these cases was summarized in our opinion in Beck v. Commissioner,85 T.C. 557, 569-570 (1985): Essential *160 to such a showing is a demonstration that petitioner had "an actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Fuchs v. Commissioner,83 T.C. 79, 98 (1984); Dean v. Commissioner,83 T.C. 56, 74 (1984). While a reasonable expectation of profit is not required, petitioner's objective of making a profit must be bona fide. Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. * * *. "Profit" in this context means economic profit, independent of tax savings. Herrick v. Commissioner, [85 T.C. 237, 254 (1985)]; Surloff v. Commissioner,81 T.C. 210, 233 (1983). Whether petitioner possessed the requisite profit objective is a question of fact to be resolved on the basis of all the facts and circumstances. Elliott v. Commissioner,84 T.C. 227, 236 (1985) [affd. 782 F.2d 1027 (3d Cir. 1986)], and cases cited therein. Although no one factor is determinative, greater weight must be given to objective facts than to petitioner's mere statement *161 of his intent. Siegel v. Commissioner,78 T.C. 659, 699 (1982); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); sec. 1.183-2, Income Tax Regs. * * * [Fn. ref. omitted.] See also Soriano v. Commissioner,90 T.C. 44, 57 (1988). There is abundant evidence in this case that tax considerations, not economic profit objective, dictated petitioner's purchase. One of the hallmarks of economically distorted tax shelters is a purported transfer of ownership at a grossly inflated sales price. Generally, the "purchaser" executes nonrecourse notes for a large portion of the purchase price. In these instances the transaction is so economically unfeasible or lacking in economic substance that the investor's primary or sole motivation in entering into the transaction is for the tax benefits (artificially bloated depreciation deductions and investment tax credits). The fair market value of the underlying asset could not conceivable support the purchase price and the nonrecourse and/or contingent debt virtually assures that the price will not be paid. Thus, our opinions have focused upon fair market value of the property and the character *162 of financing in an attempt to evaluate profit objective. In this case, the fair market value of the film was virtually nothing. In addition, the debt, while nominally recourse, could be converted to nonrecourse for the payment of $ 2,000 interest per year and a $ 1,000 principal conversion payment. We also find it curious that one and perhaps two of the other alternate conditions for convertibility had already been met at the time of purchase. [8] For purposes of assessing profit objective, we find it highly relevant that the maximum economic liability on a purported $ 93,000 debt is $ 15,000. [9] See Porreca v. Commissioner,86 T.C. 821 (1986). Cf. sec. 1.183-2(b)(4), Income Tax Regs.
There are also a number of other factors that indicate petitioner was indifferent to economic profit, and interested only in tax considerations. In cases involving purported transfers of assets, the lack *163 of an independent appraisal is highly indicative of indifference to economic profit. Where the taxpayer is inexperienced in the area, some independent indicator of profitability would be a most probative element in any finding of a genuine profit motive. Cf. cases involving appraisals, Beck v. Commissioner,85 T.C. 557, 572 (1985); Elliott v. Commissioner,84 T.C. 227, 240 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Fox v. Commissioner,80 T.C. 972 (1983). [10] See also Brannen v. Commissioner,78 T.C. 471, 508 (1982), affd. 772 F.2d 695 (11th Cir. 1984). Petitioner has not shown that he obtained any appraisals, independent or otherwise, nor did he receive any information relating to economic return. It was not shown that petitioner had any expertise in the field of television videotape. In addition, while petitioner states that he relied on a trusted business associate, we have consistently rejected such pleas when neither the taxpayer nor the person upon whom he relied knew anything about the business. See Beck v. Commissioner, supra;Flowers v. Commissioner,80 T.C. 914 (1983). *164 Petitioner's pre-purchase investigation was minimal or nonexistent. He knew nothing about the videotape business. He did nothing after his purchase, even though his "investment" was not showing any returns. The manner in which petitioner conducted this activity negates any inference that he might have been interested in economic profit. See sec. 1.183-2(b)(1)-(3), Income Tax Regs.
The videotapes have never shown a profit, nor has petitioner or EPI received anything. See sec. 1.183-2(b)(6), *165 (7), Income Tax Regs. In addition, petitioner had substantial income from other sources that could be offset by the videotape losses and credits. See sec. 1.183-2(b)(8), Income Tax Regs.
In sum, we find that petitioner did not have a profit objective in relation to the videotape activity, and thus, respondent's disallowance of the depreciation deductions and investment tax credits is sustained. Moreover, we would disallow the depreciation deductions and credits on other grounds. Depreciation and the investment credit are allowed in the year in which qualifying property is placed in service when it is placed in a condition or state of readiness and availability for a specifically assigned function. Secs. 1.46-3(d)(1)(ii), 1.167(a)-11(e)(1)(i), Income Tax Regs. While petitioner's tape may have been in existence in 1978, we do not think it is likely that it was "placed in service" until some later year, because the other tapes in the series were still not complete in 1978. See Waddell v. Commissioner,86 T.C. 848 (1986), affd.    F.2d    (9th Cir. 1988). In a prior case, we concluded that almost identical notes used to purchase television programs *166 were in essence nonrecourse. Porreca v. Commissioner, supra.Petitioners have failed to substantiate that the fair market value of the tape was even close to the stated purchase price. If the purchase price and the principal amount of a nonrecourse note unreasonably exceeds the value of the property acquired, the note does not constitute genuine indebtedness, and cannot be included in the basis of the asset. Elliott v. Commissioner,84 T.C. at 245; Hager v. Commissioner,76 T.C. 759 (1981); Flowers v. Commissioner, supra;Odend'hal v. Commissioner,80 T.C. 588 (1983), affd. on this issue 748 F.2d 908 (4th Cir. 1984); Brannen v. Commissioner,78 T.C. 471, 493 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Thus, petitioners' basis in the tape does not include the 7-year promissory note, both for depreciation and investment tax credit purposes. In addition, in Porreca we held that the notes did not represent an amount at risk within the meaning of section 465. We see no reason to depart from that holding here. [11]
*167 Petitioner may argue that there were other conditions precedent to conversion. As we have previously found, at least one of these alternate conditions was already met at the time petitioner signed the note. Thus, there is no substantial economic relationship between the triggering event and the conversion. See H. Rept. 94-658 at 110 (1976), 1976-3 C.B. (Vol. 2) 701, 802 note 10. With respect to the interest deductions, because we have previously found that the note did not constitute genuine indebtedness, amounts paid or accrued as "interest" are not deductible. Elliot v. Commissioner, and cases cited supra.
To reflect the foregoing, Decision will be entered for respondent.
Footnotes
1. Petitioners purchased their tape from John Lamb's Management Dynamics. ↩
2. World wide sales of video recorders or videotape players suitable for use in private or family residences in 1978 and prior years totaled in excess of 2,500,000 units. ↩
3. The Form UCC-1 is used to provide public notice of a security agreement pursuant to the Uniform Commercial Code. See, e.g., Cal. Com. Code secs. 9302, 9401-9403↩ (1964). 4. After protracted disagreements with ICC, Percell formed Distributors, Inc., to handle distribution of the videotapes, and apparently convinced purchasers to switch distribution companies. ↩
5. Petitioner was unable to obtain a copy of his tape for viewing prior to trial. Our conclusion is based on respondent's expert's testimony after he had viewed episode 2 of the series. ↩
6. We do not attempt to disparage the credentials of Dr. Kaufman or the quality of the series. However, petitioner has not presented any evidence of a commercial market, nor evidence of marketing ability on the part of his agents for public or educational markets. ↩
7. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
8. While the record is inconclusive, these illusory conditions may have been inserted as a screen to mask the true nature of the debt. ↩
9. The after tax economic outlay is only slightly more than half of that amount because these payments are purportedly deductible interest. ↩
10. Affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Zemel v. Commissioner,734 F.2d 9 (3d Cir. 1984), affd. without published opinion sub nom. Rosenblatt v. Commissioner,734 F.2d 7 (3d Cir. 1984), affd. without published opinion sub nom. Kratsa v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Leffel v. Commissioner, 734 F.2d (3d Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner,734 F.2d 5↩ (3d Cir. 1984). 11. While petitioner did indicate that someone was "after him" for the interest payments, that is not enough to prove intent to collect. ↩