MERRILL I. LAMB AND CAROLYN W. LAMB, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lamb v. Commissioner
Docket No. 17912-85.
United States Tax Court
T.C. Memo 1988-501; 1988 Tax Ct. Memo LEXIS 533; 56 T.C.M. (CCH) 511; T.C.M. (RIA) 88501; October 18, 1988. Theodore F. Brill, for the petitioners. Gary F. Walker and Kirk S. Chaberski, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1979 and 1980 in the amounts of $ 22,467.68 and $ 12,182.84, respectively, and additions to tax under section 6621(c) (formerly section 6621(d)). [1]
Some of the issues raised by the pleading have been disposed of by the parties, leaving for our decision: (1) Whether petitioners' purchase and leaseback of computer equipment *535 was a transaction entered into for profit, and (2) whether petitioners' were at risk within the meaning of section 465 with respect to a long-term promissory note given as part of the stated purchase price of the equipment and denominated as a limited recourse note. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, resided in Coconut Grove, Florida, at the time of the filing of their petition in this case. They filed a joint Federal income tax return for each of the calendar years 1979 and 1980 on the cash method of accounting. Merrill I. Lamb (petitioner) entered into a transaction with Equipment Leasing Management Company (ELMCO) involving the purchase and leaseback of IBM computer equipment. This equipment consisted of a processor, autocall, adapter, line addit and a printer adapter and power unit. Petitioner entered into the transaction as a tenant in common with two other investors. Petitioner's interest was 50 percent and each of the other investors had a 25-percent interest. The purchase agreement between ELMCO as seller and "investors listed on an attached schedule as tenants in common" as buyers *536 showed on the schedule that the investors entered into the transaction as tenants in common severally and not jointly. The purchase price of the equipment was $ 305,000, payable $ 65,000 at closing composed of $ 26,000 in cash, $ 22,000 in equity recourse notes due January 15, 1980, at 10 percent, and $ 17,000 in equity recourse notes due January 15, 1981, at 10 percent. The remaining $ 240,000 was payable by "limited recourse notes" at 10 percent for 9 years ($ 145,453 with recourse, $ 94,547 without recourse), payable interest only through June 30, 1979, for 30 months $ 2,508.57 a month and for 78 months $ 3,895.17 a month. The purchase agreement was executed by the parties on June 29, 1979. Mr. E. Lee Meadows is and was, at all times here relevant, the chief operating officer and sole shareholder of ELMCO. He had formed ELMCO as a sole proprietorship in 1976 and incorporated it in the spring of 1977. Mr. Meadows has a bachelor's degree in engineering from Syracuse University and a master's degree in engineering from the University of West Virginia. He worked for a number of years as an engineer for Union Carbide Corporation. In the 1950s, he was assigned by Union Carbide *537 to work with computers and was moved from the engineering department into management in the computer department. Thereafter, he was put in charge of the home office computer group of Union Carbide. In March of 1967, Mr. Meadows resigned from Union Carbide and joined a small company, Computer Leasing Company (CLC). CLC was formed in the late 1960s to enter the third-party computer leasing business. While employed by CLC, Mr. Meadows was responsible for purchasing equipment and leasing it out to end-users. He was also involved with the remarketing of the equipment owned and leased by CLC when it came of the end-user leases. In 1975 CLC was sold to Greyhound Corporation and Mr. Meadows worked for Greyhound Corporation for a short time, and after he voluntarily terminated his employment with that company, he became a consultant to the corporation. Soon after forming ELMCO in the spring of 1976, Mr. Meadows began approaching various leasing companies with the suggestion that they enter into sale/leaseback transactions with respect to their computer equipment in order to increase their available assets with which to buy additional computer equipment. Mr. Meadows would discuss with *538 representatives of the various leasing companies the method by which he would put together a transaction which would provide equity to the leasing company. Generally, Mr. Meadows would deal in IBM equipment because of the requirement that IBM service the equipment which it sold. When Mr. Meadows would approach a leasing company (the leasing companies will hereinafter be referred to as third-party lessors since they leased the equipment to other corporations that used it and the sub-lease corporations will be referred to as end-users or user-lessees), he would explain to its representatives that he would enter into a purchase agreement to buy the equipment with a down payment and a nonrecourse promissory note which would be secured by the equipment after he had put together a package and found investors to purchase the equipment from him at a higher price than he had paid for it. The increased amount of the purchase price would be in the down payment by the investors and the long-term promissory note to be paid to ELMCO by the investors would be in the exact amount and with the same payment terms as his note to the third-party lessor. The long-term note was to be paid by the rental *539 payments from the third-party lessors for a leaseback of the equipment. The third-party lessors would have the equipment on lease to user-lessees. The payments made by the user-lessees would be used by the third-party lessors to make their rental payments. Generally, the payments by the lessees were slightly more than the payments on the long-term notes. ELMCO's profit would come from the difference in the amount it paid for the equipment and the amount for which it sold the equipment. The equipment which Mr. Meadows would arrange to buy generally had been purchased by the third-party lessors from the manufacturer, in this case IBM, for a down payment and a note to a bank which financed the purchase for the third-party lessors. The bank note was payable over a period of time. Because the equipment was security for the bank note, ELMCO would purchase the equipment subject to the bank's lien. It was understood that ELMCO would purchase the equipment simultaneously with its sale and only for resale to the investors. The transaction between ELMCO and petitioner in this case follows the general outline of most of ELMCO's transactions. Here ELMCO had arranged to purchase the equipment *540 from SP Computer Capital, Inc. (Computer Capital). The equipment that ELMCO purchased from Computer Capital, the third-party lessor, was on lease by Computer Capital to Standard Brands, Inc.
When Mr. Meadows had put together investment transactions to be offered for sale he would prepare an offering memorandum on behalf of ELMCO which would set forth the basis of the offer. [2] If after reading the offering memorandum a prospective investor was interested in the transaction, an investor's closing packet would be furnished to such prospective investor. This packet would contain a subscription questionnaire in which the prospective investor would have to indicate his yearly income, his tax bracket, his net worth, his educational background, and information with respect to his investments. Also contained in the packet was a subscription agreement which set forth the price of the equipment and loan payments to be made. *541 The subscription agreement signed by petitioner in this case stated that petitioner's check payable to the order of an escrow account in the amount of $ 13,000, together with two promissory notes in the amounts of $ 11,000 and $ 8,500, respectively, were enclosed as down payment for the purchase of a 50-percent interest in the computer equipment described in the offering memorandum dated May 21, 1979. The subscription agreement acknowledged receipt of the offering memorandum and stated that the subscriber had read it and was familiar with its content. The subscription agreement contained a statement that "Any Federal income tax benefits which may be available to the undersigned may be lost through changes in, or in the interpretation of, existing laws and regulations * * *." The packet also contained a purchase agreement between ELMCO as the seller and the investors, here petitioner, as buyer. This agreement which was signed by the parties on June 29, 1979, stated in part as follows: Seller is the owner of the equipment and accessories thereto (collectively, the "Equipment") listed and described in Schedule A attached hereto. All of the Equipment will be leased (pursuant to the *542 "Master Lease") to SP COMPUTER CAPITAL, INC., a New York corporation (as "Lessee"). All of the Equipment will be subleased to the actual users ("Underlying Lessees") pursuant to lease agreements between Lessee, as lessor, and Underlying Lessees, as lessees ("Underlying Leases"). The Underlying Lease in effect on the date hereof (the "Existing Underlying Lease") is listed and described in Schedule A. Seller has also entered into an agreement ("Remarketing Agreement") with Lessee appointing Lessee as Seller's agent to dispose of the Equipment upon the termination of the Master Lease. Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, all of the Equipment together with Seller's rights under the Master Lease and Remarketing Agreement subject and subordinate to the prior lien described in Schedule A (the "Existing Lien"), to the rights of the Lessee under the Master Lease, to the rights of the Underlying Lessee under the Existing Underlying Lease, and to the purchase money lien on the Equipment in favor of Lessee ("Purchase Money Lien"). The Existing Lien, and the Purchase Money Lien are referred to herein as the "Senior Liens". 1. Purchase of Equipment.
*543 1.1 Conveyance of Equipment. Subject to the terms and conditions hereof, Seller shall transfer, convey, assign, set over, bargain, sell and deliver unto Buyer, and the Buyer shall purchase from the Seller, the Equipment, and all rights as lessor under the Master Lease and as Owner under the Remarketing Agreement, subject and subordinate to the Senior Liens and the rights of the Underlying Lessee. Seller shall deliver to Buyer, on the date specified for the payment of the purchase price specified in section 1.2 below, a bill of sale (the "Bill of Sale") for the Equipment. * * * (f) This Agreement and the Other Documents constitute the valid and binding obligations of Seller enforceable in accordance with their respective terms. * * * 5. Indemnification. Seller will indemnify Buyer and hold Buyer harmless from and against any and all loss, cost, damage, injury or expense, including, without limitation, reasonable attorney's fees, wheresoever and howsoever arising which Buyer may incur by reason of any material breach by Seller of any of the representations by, or obligations of, Seller set forth in this Agreement * * *.
Also included in the packet was the *544 purchase agreement between Computer Capital as seller and ELMCO as buyer, the master lease by which ELMCO leased back the equipment to Computer Capital, the remarketing agreement between ELMCO and Computer Investors Group, Inc. (CIG), the parent of Computer Capital, and documents relating to the transaction between ELMCO and Computer Capital. The packet contained an assignment for ELMCO to petitioner which was entered into by the parties on June 29, 1979. This assignment provided in part as follows: ELMCO, INC. ("ELMCO") hereby assigns to Merrill Lamb per attached schedule of percentage all of its right, title and interest in and to the Lease Agreement by and between ELMCO, as Lessor, and SP COMPUTER CAPITAL, INC., as Lessee ("Lease"), the Purchase Agreement between ELMCO, as Buyer, and Lessee, as Seller ("Purchase Agreement"), as well as the Remarketing Agreement between ELMCO, as Owner, and CIG, as Agent ("Remarketing Agreement"), all dated June 29, 1979. * * * ELMCO does hereby warrant and represent that the Lease and Remarketing Agreement are in full force and effect, that there are no defaults or causes for default thereunder, that it has not assigned or pledged, and *545 hereby covenants that it will not assign or pledge, so long as this Assignment shall remain in effect, the whole or any part of the rights hereby assigned, to anyone other than Assignee or Assignee's successors or assigns, that the warranties contained therein are true and correct as of the date of execution and remain true and correct as of the date hereof. The equity promissory notes from petitioner to ELMCO due January 15, 1980 and January 15, 1981, were recourse notes. The "limited recourse promissory note" to ELMCO from petitioner (hereinafter the long-term note), a 5-page document, was also signed June 29, 1979. It recited the fact that the payor and payee were parties to a purchase agreement pursuant to which the payee had sold and assigned to payor certain equipment which was leased by the payee as lessor to Computer Capital (referred to as the master lease), and that the note represented a part of the purchase price. The note also provided that to secure payment when due, the payor granted to the payee, subject and subordinate however to senior liens, the master lease and the rights under the underlying leases, a security interest in and to the equipment. The long-term *546 note under "principal" stated $ 145,453 with recourse, $ 94,547 without recourse, $ 240,000 total. The payment schedule stated that all payments are due in arrears on the last day of each month commencing on the last day of June, 1979. The payment called for was interest only to June 30, 1979 for 30 months at $ 2,508.57 a month and for 78 months at $ 3,895.17 a month. The purchase agreement between ELMCO as buyer and Computer Capital as seller which was executed on June 29, 1979, provided for a purchase price of $ 278,475, payable by cash at closing of $ 38,475 and a nonrecourse note at 10 percent for 9 years of $ 240,000 payable as follows: for 30 months $ 2,508.57 a month and for 78 months $ 3,895.17 a month. The purchase agreement contained among other provisions the following: 1.1 Conveyance of Equipment. Subject to the terms and conditions hereof, Seller shall, and hereby does, transfer, convey, assign, set over, bargain, sell and deliver unto Buyer, and the Buyer hereby purchases from the Seller, the Equipment, subject and subordinate to the Senior Liens and the rights of the Underlying Lessee. Seller hereby delivers to Buyer, and Buyer hereby acknowledges receipt *547 of, a bill of sale (the "Bill of Sale") for the Equipment. Insofar as Seller is the indirect possessor of the Equipment, Seller sells, transfers, conveys and assigns its rights against the direct possessor thereof. * * * 1.3 Leaseback. Simultaneously with the purchase of the Equipment by Buyer hereunder, Buyer and Seller are entering into a lease (the "Lease") under which Buyer is leasing the Equipment back to Seller, subject and subordinate to the Senior Liens and the rights of the Underlying Lessee. 5. Indemnification. Seller will indemnify Buyer and any of its directors, officers, agents, employees and stockholders and hold them harmless from and against any and all loss, cost, damage, injury and expense, including, without limitation, reasonable attorney's fees, wheresoever and howsoever arising which Buyer or any of its directors, officers, agents, employees or stockholders, may incur by reason of any material breach by Seller of any of the representations by, or obligations of, Seller set forth in this Agreement * * * 6.5 Limited-recourse. Anything in this Agreement to the contrary notwithstanding, Seller shall look solely and only to the Collateral (as *548 defined in the Limited Recourse Promissory Note-Security Agreement) for the payment and performance by Buyer of all of its agreements. Seller, for itself and its successors and assigns, hereby expressly waives any rights to enforce payment for performance by Buyer of all of its agreements hereunder, or to recover damages for, any breach of covenant or agreement of, Buyer hereunder, other than to proceed against the Collateral in the manner provided for in the Limited Recourse Promissory Note-Security Agreement * * *.
A copy of the purchase agreement between ELMCO and Computer Capital and a copy of the limited recourse promissory note-security agreement between ELMCO and Computer Capital, both executed June 29, 1979, were included in the investor's packet. There was also included in the packet a copy of the lease agreement between ELMCO as lessor and Computer Capital as lessee. This lease was a net lease providing for payment of all costs by the lessee. It also provided that the lessee might sub-lease the equipment and that the lease might be assigned by the lessor. It also contained the following provisions: Lease Agreement ("Lease") between Elmco, Inc. ("Lessor") and SP COMPUTER *549 CAPITAL, INC. ("Lessee"). Lessor agrees to lease the equipment listed in Schedule A, attached hereto (the "Equipment") to Lessee, and Lessee hereby agrees to lease the deficiencies from Lessor, on the terms and subject to the conditions specified herein. The definition of terms in the Purchase Agreement between the parties regarding the Equipment shall apply herein. * * * 2. Rent. Lessee hereby agrees to pay Lessor rent in the amounts and on the dates specified in Schedule B. * * * LEASE AGREEMENT
SCHEDULE B
Rent Payment Schedule
Date of Commencement:
June 29, 1979
Date of Termination:
June 30, 1988
Rental Payments:
First Partial Payment:
($ 66.67 per day)
$   133.34
First 30 months:
$ 2,508.57 per month
Next 78 months:
$ 3,997.17 per month
Additional Rent: During the last 24 months of the lease term, Lessee shall pay to Lessor, as additional rent, 50% of all rent received from any Underlying Lessee. ALL PAYMENTS ARE DUE IN ARREARS ON THE LAST DAY OF EACH MONTH COMMENCING ON THE LAST DAY OF JUNE, 1979 Contained in the packet was a guaranty from CIG as guarantor *550 to ELMCO as the lessor executed June 29, 1979. This document provided in part: GUARANTY
Guaranty given by COMPUTER INVESTORS GROUP, INC., hereinafter called the Guarantor, to ELMCO, INC., hereinafter called Lessor. Whereas Guarantor is anxious to induce Lessor to enter into a sale/leaseback transaction of computer equipment with SP COMPUTER CAPITAL, INC. as Seller/Lessee, hereinafter sometimes called Lessee, and ELMCO, INC. as Purchaser/Lessor, and WHEREAS Lessor is willing to enter into such transaction only if the Guarantor guarantees the faithful performance of all the obligations of SP COMPUTER CAPITAL, INC. as both Seller and Lessee, The Guarantor therefore, in consideration of the foregoing, and in consideration of receipt of a portion of the consideration paid by ELMCO, INC. to SP COMPUTER CAPITAL, INC., agrees as follows: 1. OBLIGATION. The Guarantor hereby guarantees the prompt and complete performance by Lessee of all the covenants and conditions contained in the contracts between Lessor and Lessee pertaining to the equipment described on Schedule A attached hereto, and the payment of all damages, costs, and expenses which by virtue of the foregoing *551 contracts might become recoverable by Lessor from Lessee. The contracts which are included in this guaranty are the Purchase Agreement, Limited Recourse Promissory Note -- Security Agreement and Lease Agreement all of even date herewith. As part of Guarantor's obligations hereunder, Guarantor hereby represents and warrants to lessor that the lessee under the Existing Underlying Lease is obligated to make payments under said lease sufficient to pay the debt secured by the Existing Lien in full * * *. 2. CHARACTER OF OBLIGATION. The obligation of the Guarantor is a primary and unconditional obligation. * * * 3. TERM OF GUARANTY. This guaranty shall continue until all the terms of the foregoing contracts have been fully performed or otherwise discharged; and the Guarantor shall not be released of its obligations hereunder so long as any claim of Lessor against Lessee arising out of the foregoing contracts is not settled or discharged in full.
The Remarketing Agreement between CIG and ELMCO dated June 29, 1979, provided in part as follows: REMARKETING AGREEMENT, between COMPUTER INVESTORS GROUP, INC., a New York corporation, having its principal office and place *552 of business at 1351 Washington Blvd., Stamford, Connecticut 06902 ("Agent"), and ELMCO, INC., a Maryland corporation, 152 Rollins Avenue #206, Rockville, Maryland 20852 ("Owner"). 1. Background
Owner and Agent are parties to an agreement of even date ("Purchase Agreement"), pursuant to which Owner acquired the Equipment from Agent and leased that Equipment to Agent pursuant to the Lease. * * * 3. Remarketing Procedures
Owner hereby irrevocably (except as otherwise provided in Section 5.2) appoints Agent as its agent to remarket Equipment upon termination of the Lease. Agent accepts such appointment and agrees to exert reasonable efforts to remarket Equipment, by sale or lease, from and after the end of the term of the Lease. Agent shall have no power or authority to bind or obligate Owner under this Agreement without first obtaining Owner's written consent. Agent shall remarket Equipment on terms and at a consideration acceptable to Owner (as to both the rate and creditworthiness of the proposed buyer or lessee) and Owner's consent shall not be unreasonably withheld. 4. Compensation
As compensation for the services to be rendered by Agent to Owner hereunder, *553 Owner shall pay to Agent the fees stated on the Fee Schedule, attached hereto. Fees are based on the net proceeds from sale or lease, meaning the total proceeds, less reasonable expenses (not including commissions paid to sub-agents). All fees hereunder shall be due and payable as and when the net proceeds are actually collected. The packet also contained an assignment executed June 29, 1979, whereby ELMCO assigned "all its rights, title and interest" in the lease agreement between ELMCO and Computer Capital, the purchase agreement between them and the remarketing agreement between ELMCO and CIG to petitioner and the other two investors. The parties to the transaction involved herein had an unwritten agreement that other than the excess rental payments, all transactional payments would offset each other and that no actual payment would be made between the parties. The excess rental payments which began after the 30th month of the lease were to be paid to the investors. ELMCO agreed to collect and accumulate these payments and pay them to the investors on a half-yearly or yearly basis. Submitted to petitioner with the offering memorandum was an appraisal by a Mr. Thomas J. *554 Norris of the residual value of the equipment which was being offered for sale to the investors as of June 30, 1988, the termination date of the lease. This appraisal gave as Mr. Norris' opinion that the rentals provided for in the agreement were in line with current industry standards, that the fair market value of the equipment at the date of sale was $ 305,000 and that the sale value (residual) on June 30, 1988, is projected to be $ 61,000. The appraisal also gave as Mr. Norris' opinion that during the last two years of the lease, June 30, 1986 to June 30, 1988, the equipment should rent for at least $ 1,822 per month and that the useful life of the equipment would be at least twelve years. Petitioner, in going over the offering memorandum, also reviewed the appraisal of Mr. Norris dated June 5, 1979, which was submitted therewith and the resume of Mr. Norris which accompanied the appraisal. Petitioner in this case is and at the time of the transaction here involved was entered into was a restaurant executive. He has been in the restaurant business for 18 years. He was President and chief executive officer of Cozzoli's Pizza System, Inc., which is a group of companies that *555 franchise pizzarias. As President of his company, petitioner would seek locations, meet with landlords, negotiate leases, deal with architects, and lay out equipment. He also would hire contractors and supervise them, arrange loans to cover either the purchase or the leasing of restaurant equipment and franchise stores to third persons. In addition to its franchise business, petitioner's company owns approximately 20 restaurants. Petitioner, in connection with his restaurant business, has also bought equipment used in that business and has leased equipment for his business on 5 to 7 year leases. Before entering into the transaction here involved, petitioner read all the documents furnished to him and understood the import of these documents. In deciding to enter into the transactions, petitioner considered the amount he might expect to receive for the equipment at the end of the lease either by a further rental of the equipment or its sale. He considered the fact that the equipment would be kept in good repair by IBM. Petitioner asked the attorney who was handling the transaction on behalf of ELMCO to explain all the details of the transaction to him. Petitioner made the *556 payments due on his two equity notes on or before the due day thereof. The investors in the transaction in total would need to receive in residual value for the equipment and from rent sharing in the last 2 years of the lease, $ 60,857 in order to break even financially on the computer/leaseback transaction. [3] The residual value as predicted by Mr. Norris of $ 61,000 plus $ 21,864 of rent sharing payments during the last 2 years the equipment was on lease, would have resulted in a profit on the transaction of a little over $ 22,000 or an $ 11,000 profit for petitioner's 50-percent interest. In addition, there was always the possibility that the equipment might continue to be rented and produce more than its actual sale residual value. Computer equipment when well maintained *557 does not physically deteriorate appreciably. The depreciation of computer equipment and reduction in its value is primarily due to technological changes causing the introduction of more efficient equipment. For this reason, it is difficult to determine the residual value of computer equipment. The range of the total residual value of the equipment in which petitioner was a 50-percent investor reasonably to be projected in June 1979, at the time the equipment was leased, including anticipated rent sharing and sales value of the equipment at the conclusion of the lease, was between $ 18,000 and $ 89,000. This is based on rent sharing for the last 2 years of the lease and a sale of the equipment at the termination of the lease in June 1988. If the equipment could remain on lease after the termination of the lease involved in this transaction, the value might be greater. Petitioner on his Federal income tax return for the calendar year 1979 claimed a loss of $ 44,193 in connection with his computer leasing transaction. This was computed by reducing the reported income from the transaction of $ 7,592 by depreciation of $ 45,750 and interest of $ 6,035. On his Federal income tax *558 return for the calendar year 1980 petitioner claimed a loss from the transaction of $ 29,357 which was arrived at by subtracting from reported income from the transaction of $ 15,051, $ 32,025 depreciation and $ 12,383 interest. Respondent in his notice of deficiency to petitioner disallowed the entire claimed losses on the computer leasing transaction for each of the years 1979 and 1980 and also determined that additional interest was due under section 6621(c). Respondent explained his determination on the basis that the loss deductions claimed from the computer sale/leaseback transaction in 1979 and 1980 were disallowed because it had not been established that the losses were incurred in a trade or business or with respect to property held for the production of income. In the alternative, respondent determined that the promissory note executed by petitioner is in fact a nonrecourse obligation and cannot be included in the amount "at risk" on the equipment for purposes of computing petitioner's allowable loss in each year and, therefore, the loss from the lease in each of the years 1979 and 1980 is limited to petitioner's cash investment in the equipment. Respondent determined *559 that in each of the years a portion of the deficiency constituted a substantial underpayment attributable to a tax-motivated transaction under section 6621(c). OPINION This case was tried at the same time as the consolidated cases of Young v. Commissioner,T.C. Memo. 1988-440, filed September 15, 1988, but was not consolidated with those cases. However, much of the testimony is the testimony taken in the consolidated cases. In fact, except for petitioner's own testimony and the testimony of certain expert witnesses, including Mr. Esmond C. Lyons, Jr., who prepared a separate report with respect to petitioner's case, and certain of the testimony of respondent's expert witness, Mr. McEwen, all the testimony is the same. The documentary evidence in this case consists of documents in connection with the transaction involved in this particular case. However, as is obvious from the findings we have made from these documents, they are much the same as the documents in Young v. Commissioner, supra.
Respondent's position in this case is essentially the same as it was in certain of the cases involved in Young v. Commissioner, supra. *560 Respondent does not contend in this case that the transaction lacked economic substance, but contends as he did in the case of a number of the taxpayers who were consolidated in Young v. Commissioner, supra, that petitioner did not enter into the transaction here involved with an actual and honest objective of making a profit therefrom. Respondent also argues in this case as he did with respect to the taxpayers involved in the Young case, that petitioner was protected against loss on the amount due under his long-term installment note through guarantees, stop loss agreements, or other similar agreements, and therefore was not at risk with respect to any portion of their long-term note within the meaning of section 465. Finally respondent contends here, as he did with respect to the taxpayers involved in the Young case, that ELMCO was not a substantive party to the transaction but was inserted in the chain of title as a straw man rather than a substantive participant. Respondent argues here as he did in the Young case that petitioner's long-term notes are in effect payable directly to the third-party lessor, Computer Capital, and that the third-party *561 lessor had an interest other than as creditor in the transactions. On the basis of these contentions with respect to petitioner's long-term notes, respondent contends that petitioner was not "at risk" under the provisions of section 465(b)(3) and (4). Finally here, as in the Young case, respondent contends that petitioner is liable for the increased interest rate provided for by section 6621(c) because of a substantial underpayment attributable to a tax-motivated transaction. In this case as we pointed out in the Young v. Commissioner, supra, case, the determination of whether the computer equipment purchase/leaseback transaction should be recognized for tax purposes is factual. We have had this issue before us in a number of cases, many of which are cited in the Young case. See Larsen v. Commissioner,89 T.C. 1229 (1987). Based on Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 91 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983), we have uniformly held that a purchase/leaseback transaction *562 should be disregarded for Federal income tax purposes if it is determined that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering into the transaction and the transaction has no economic substance because no reasonable possibility of profit exists. As pointed out in Torres v. Commissioner,88 T.C. 702 (1987), a finding of lack of economic substance is inappropriate if either a business purpose or a reasonable possibility of profit apart from expected tax benefits is found to be present. Considering this record as a whole, we determine that petitioner did have a reasonable possibility of profit from this transaction other than obtaining tax deferrals and did have a business purpose for entering into the transaction. A lengthy discussion here would serve no useful purpose. The transaction as presented to petitioner showed that overall there was a likely profit and petitioner's investigation confirmed this. Also the testimony of Mr. Lyons, petitioner's expert, shows that as difficult as it is to predict the value of computer equipment which physically deteriorates very little but may lose value rapidly because of technological *563 improvements producing faster and more efficient equipment, there appears to be a reasonable likelihood of profit to petitioner from the transaction. Based on this record, in our view, the purchase/leaseback transaction should be recognized for tax purposes. While a profit was not assured, a reasonable investigation at the time the transaction was entered into would lead to the conclusion that there was a reasonable possibility of profit and depending on unpredictable factors it might be greater or smaller. Section 465(a) provides that in a transaction involving section 1245 property which is leased, any loss for the taxable year shall be allowed only to the extent that the taxpayer is at risk with respect to the activity at the close of the taxable year. Section 465(b) provides that a taxpayer is "at risk" for the amount of money and his basis in property contributed to an activity plus borrowed amounts for which he is personally liable or which are secured by property other than the property used in the activity to the extent of the value of the other property. Here, petitioner paid *564 $ 13,000 in money for the equipment. He also gave two equity notes as part of his down payment on the equipment which were recourse notes. Respondent does not contend that petitioner was not at risk in the amounts of these notes of $ 11,000 and $ 8,500, a total of $ 19,500. Therefore, clearly petitioner was at risk to the extent of $ 32,500 with respect to his computer purchase/leaseback transaction. The issue concerns the long-term installment note. In Porreca v. Commissioner,86 T.C. 821, 838 (1986), we pointed out that the legislative history of section 465 shows a concern with situations in which a taxpayer is effectively "immunized from any realistic possibility of suffering an economic loss even though the underlying transaction was not profitable." As we pointed out in Young v. Commissioner, supra, the entire setup of the ELMCO transactions and particularly of the transaction here involved is strongly indicative that the investor would never be called upon to pay any portion of his long-term installment note, whether the note was stated to be recourse or not. As we pointed out there, the underlying indebtedness with which ELMCO purchased *565 the equipment was nonrecourse, the third-party lessor had a nonrecourse indebtedness to a bank for the purchase price of the equipment and the bank had a first lien on the equipment to secure that indebtedness. The amount due by ELMCO on its nonrecourse note to the third-party lessor was identical to the amount due by petitioner to ELMCO on its long-term installment note. The payment schedule was identical and no actual money with respect to the payment of these notes changed hands since the lease payments discharged the notes. In Young v. Commissioner, supra, we concluded that since ELMCO had assigned its rights under its purchase agreement and lease to the investors including the rent payments, it was extremely unlikely that ELMCO would attempt to enrich itself at the expense of the investors if its nonrecourse indebtedness were discharged by sale of the equipment or otherwise. In fact, as long a payments were made by the lessor, petitioner's notes to ELMCO were paid. As we concluded in Young v. Commissioner, supra, and also conclude here, ELMCO's part in the transaction was primarily, if not exclusively, to furnish a vehicle by which the investors *566 could attempt to claim that their long-term notes were "at risk" when in reality because of the protections in the structure of the transaction they were not. In the Young v. Commissioner, supra, we pointed out that in our view the various rights assigned to the investors plus their indemnification against loss by ELMCO causes their liabilities on the installment notes in substance to be only secondary liabilities on ELMCO's nonrecourse note. Here as in the Young v. Commissioner, supra, case, petitioner was effectively immunized from any realistic possibility of suffering an economic loss even though the underlying transaction was not profitable. Porreca v. Commissioner,86 T.C. at 838. The transaction here involved is one of the ELMCO transactions that most clearly demonstrates the lack of any real possibility of petitioner's being called upon to pay any amount on his long-term installment note. Here, in addition to ELMCO's indemnification of petitioner and Computer Capital's indemnification of ELMCO in a purchase agreement assigned to petitioner, ELMCO had a guaranty agreement from CIG for the payment of all of the amounts *567 due by Computer Capital under its lease. This guaranty was effectively a guarantee of the payment of petitioner's note to ELMCO since it was these payments from Computer Capital that paid petitioner's note to ELMCO. Having assigned the rights under its lease to petitioner, ELMCO was certainly obligated to see that this guarantee was enforced. Here there is some indication in the record that at times on some of its leases, Computer Capital failed to pay the excess rentals that went in cash to the investors. Apparently it at all times paid the rental necessary to discharge the notes. When these excess rentals were not paid, ELMCO turned to CIG to require payment of the amounts to the investors. Therefore, in this case there was a clear effective arrangement which assured that petitioner would never be called upon to be personally liable on any portion of the long-term note. On the basis of the facts here both as to the overall setup, the roll played by ELMCO, and the indemnity and guaranty agreements, we conclude that there existed no "realistic possibility" of petitioner's suffering an economic loss even though the underlying transaction turned out to be nonprofitable. We therefore *568 conclude and hold that petitioner is entitled to the losses incurred in this transaction to the extent of his cash down payment plus the recourse equity notes signed by him and that he is not entitled to losses based on any part of the long-term installment note even though a part of that note was designated recourse. Section 6621(c) provides for an increased rate of interest with respect to any substantial underpayment which is attributable to tax-motivated transactions. This increased rate is applicable for interest accruing after December 31, 1984. Section 6621(c)(2) defines a substantial underpayment as an underpayment greater than $ 1,000. Section 6621(c)(3)(A)(ii) specifically includes in the definition of tax-motivated transactions a loss disallowed by reason of section 465. Since we have concluded in this case that part of the underpayment is attributable to petitioner's losses which are disallowed under section 465, if this disallowance results in an underpayment in excess of $ 1,000, petitioner is liable for the section 6621(c) additional interest with respect to the amount *569 of underpayment due to the disallowance of such losses. Decision will be entered under Rule 155.
Footnotes
1. All references are to the Internal Revenue Code of 1954 as applicable to the years here in issue. ↩
2. The offering memorandum involving the transaction in this case is not in the record but other documents in the record refer to this offering memorandum and the subscription by petitioner states that he has read the offering memorandum and acknowledges certain facts set forth therein. ↩
3. This is composed of $ 26,000 cash down payment, principal of $ 22,000 on the first equity note with interest of $ 1,192 for a total of $ 23,192, $ 17,000 principal on the second equity note with interest of $ 2,621 or a total of $ 19,621 making total cash outlay for the investors of $ 68,813 less $ 7,956 of excess of rental payments over installment note payments for the last 78 months of the lease. ↩