ALAN J. COHEN AND DOROTHY E. COHEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cohen v. Commissioner
Docket No. 13508-85.
United States Tax Court
T.C. Memo 1988-525; 1988 Tax Ct. Memo LEXIS 550; 56 T.C.M. (CCH) 629; T.C.M. (RIA) 88525; November 10, 1988
Steven S. Brown, Harvey M. Silets, Royal B. Martin, Jr. and Leigh D. Roadman, for the petitioners. Gary Walker and Kirk Chaberski, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1981 and 1982 in the amounts of $ 260,978.34 and $ 161,475.50, respectively, and further determined that petitioners were liable for the increased interest rate provided for under I.R.C. sec. 6621(c). [1]
Some of the issues raised by the pleadings have been disposed of by the parties, *553 leaving for our decision only: (1) whether the deductions claimed by petitioners in connection with a purchase/leaseback of computer equipment in each of the years here in issue are limited by the amounts for which petitioners were "at risk" within the meaning of section 465, and if they were so limited, the amounts for which petitioners were "at risk;" and (2) whether petitioners are liable for the additional interest provided for by sec. 6621(c). [2]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, whose legal residence was in Miami, Florida at the time of the filing of their petition in this case, filed joint Federal income tax returns for the calendar years 1981 and 1982 on the cash method of accounting with the Internal Revenue Service Center in Atlanta, Georgia. On May 27, 1981, Mr. *554 Joel Cohen and Alan Cohen (petitioner) as tenants in common, entered into a purchase agreement with Computer Trading Corporation (CTC), to purchase certain computer equipment which was the subject of a purchase agreement between CTC and Tiger Computer, a division of National Equipment Rental Ltd. (Tiger). CTC is a wholly owned subsidiary of ELMCO, Inc. Mr. E. Lee Meadows is and has been since its formation, the sole shareholder and chief executive and operating officer of ELMCO, Inc. Mr. Meadows is also the chief executive officer of CTC. Mr. Meadows negotiated purchase/leaseback transactions both on behalf of ELMCO, Inc., and CTC. After obtaining both a bachelor's and a master's degree in engineering, Mr. Meadows began working as an engineer for Union Carbide Corporation. Later he became the person in charge of the Carbide Corporation. Later he became the person in charge of the computer operations at Union Carbide. In 1967, he resigned from Union Carbide and joined a small company, Computer Leasing Company, which had been formed in the late 1960s to enter into the third-party computer leasing business. Mr. Meadows was the vice-president of Computer Leasing Company, and *555 as such, was responsible for purchasing computer equipment and leasing it to end-users. One of the concerns of Computer Leasing Company was remarketing the equipment after it came off of lease, and that corporation was successful in such remarketing while Mr. Meadows was associated with it. In 1975, Greyhound Corporation purchased Computer Leasing Company, and Mr. Meadows became employed by Greyhound Corporation. Mr. Meadows resigned from Greyhound Corporation in September 1975, but continued to work for it as a consultant regarding its third-party leasing business until May 1976. While working as a consultant for Greyhound, Mr. Meadows became aware of the opportunity to arrange to purchase equipment from leasing companies (hereinafter referred to as third-party lessors) and sell an investment package of the equipment to various investors. Generally, leasing companies such as Computer Leasing Company, for which Mr. Meadows had worked, would buy computer equipment from the manufacturer and lease it to end-users. Generally, the equipment would be bought with financing and the rent from the sublessees (end-users or user-lessees) would be used to pay off the indebtedness on the equipment. *556 Mr. Meadows, in talking to various third-party lessors, became aware that they could expand their business by selling computer equipment they had on lease at some profit and using the money to buy additional equipment. He approached a number of these companies suggesting that he agree to purchase, on behalf of either ELMCO, Inc. or CTC, equipment on lease to user-lessees from the third-party lessors and put together a package to resell the equipment to investors. The plan was that his purchase contract would be executed simultaneously with the sale of the equipment to the investors. The equipment, which petitioner and Mr. Joel Cohen purchased from CTC in this case, was acquired by CTC in such a transaction. In these transactions, other than the down payment, ELMCO, Inc., or CTC would pay the third-party lessor for the equipment with a nonrecourse installment note which would be paid in the exact amount of and had the exact payment terms as the long-term installment note which ELMCO, Inc., or CTC received from the investors. The investors' installment note to ELMCO, Inc. or CTC would be paid from the rentals received from the third-party lessors to which the equipment was leased *557 back. On May 27, 1981, CTC, as purchaser, executed a purchase agreement with Tiger, as seller, regarding certain computer equipment. This computer equipment was the equipment which was the subject of the investment plan proposed by CTC to petitioner and Mr. Joel Cohen. The purchase price that CTC was to pay Tiger for the equipment was $ 2,808,620. The down payment consisted of $ 24,000 in cash and purchase money equity notes totalling $ 332,120. The balance was paid by a nonnegotiable nonrecourse promissory note in the amount of $ 2,452,500. The nonrecourse note for $ 2,452,500 which CTC gave to Tiger was for a term of 108 months, payable monthly, commencing on June 30, 1981, and ending on May 30, 1990. The first 43 monthly payments were to be in the amount of $ 30,656.25 each and the remaining 65 monthly payments were to be in the amount of $ 55,334.97 each. The purchase agreement which Mr. Joel Cohen and petitioner entered into with CTC on May 27, 1981, simultaneously with CTC's purchase of the equipment from Tiger, provided for the Cohen's purchase of the equipment which CTC was to acquire from Tiger. The aggregate purchase price to be paid by the Cohens to CTC was *558 $ 3,000,000 consisting of $ 40,000 in cash, negotiable recourse purchase money equity notes totalling $ 507,500 and an installment note stated to be partially recourse and partially nonrecourse in the amount of $ 2,452,500. This $ 2,452,500 promissory note (the installment note) stated that its recourse portion was limited to the amount of $ 1,941,851. This installment note was for a term of 108 months and provided for 108 monthly payments commencing on June 30, 1981, and ending on May 30, 1990. Here as in the case of the nonrecourse note from CTC to Tiger, the first 43 monthly payments were to be in the amount of $ 30,656.25 each and the remaining 65 monthly payments were to be in the amount of $ 55,334.97 each. CTC's note to Tiger and the Cohens' note to CTC bore the same rate of interest. Simultaneous with the purchase of the equipment by the Cohens, they executed a lease of the equipment to Tiger. The term of the lease between the Cohens and Tiger was a period of approximately nine years ending May 31, 1990. The lease was a net lease and provided that the lessee was entitled to sublease the equipment. In fact, at the time the lease was entered into, the equipment was *559 leased in the most part to American Telephone & Telegraph Company (AT&T). However minor portions of the equipment were leased to another lessor. The lease called for rental payments of $ 30,656.25 a month for the first 43 months (June 30, 1981 through December 30, 1984) and for monthly rental payments of $ 57,440.97 a month for the remaining 65 months (January 30, 1985 through May 30, 1990). It also provided for Tiger's sharing with the Cohens its sublease receipts, if any, after June 30, 1986. There was a lien on the equipment to a bank for the amount which the bank had lent to Tiger on a nonrecourse note for the initial purchase of the equipment. The equipment subject to this prior lien also secured the nonrecourse note of CTC to Tiger. The purchase agreement between CTC as seller and the Cohens as purchaser provided that the seller sells and purchaser purchases the equipment described in the attached schedule, subject and subordinate to the rights of the holders of the encumbrances and the rights of the lessees and sublessees listed in the attached schedule. This purchase contract further provided under the section entitled indemnification as follows: Seller will indemnify *560 Purchaser and protect, defend and hold it harmless from the against any and all loss, cost, damage, injury or expense, including, without limitation, reasonable attorneys' fees, wherever and however arising which Purchaser may incur by reason of any material breach by Seller of any of the representations, warranties and covenants or obligations set forth herein, or by reason of the bulk transfer laws of any jurisdiction. The purchase money equity notes given in part payment for the equipment by the Cohens to CTC provided that "To secure payment of the amounts of principal and interest due hereunder, the Payor (the Cohens) has executed a Security Agreement of even date herewith granting the Payee a security interest in the Equipment and the Payor's rights to and under certain agreements (collectively, the 'Collateral')." The security agreement itself provided that it was to secure the entire indebtedness including the installment note. The collateral was stated to be: 2.1 The Equipment as now or later described in the Schedule in accordance with the provisions of the Purchase Agreement; and 2.2 The Debtor's rights under the following agreement: a. The lease of even date herewith *561 by and between the Debtor as lessor and TIGER COMPUTER, a Division of National Equipment Rental, Ltd., a Delaware business corporation ("NER"), as lessee; b. The Collateral Lease Assignments by and between Debtor and NER * * *. The installment note also provided that CTC had no right "to accelerate or otherwise change the timing or amount of payments due hereunder from the time and amounts specified" (43 monthly payments of $ 30,656.25 and 65 monthly payments of $ 55,334.97) without the written consent of the Cohens except in the case of an assignment for benefit of creditors or bankruptcy of the Cohens. Simultaneously with the execution of the lease, Tiger as assignor and the Cohens as the secured party entered into a collateral lease assignment. This document provided that the secured party (the Cohens) is acquiring the various items of equipment designated in the schedules attached hereto and will lease the equipment to the assignor pursuant to a lease of even date and that (1) the assignor is subleasing the equipment to end-users pursuant to a certain lease agreement, (2) the secured party requires that it be provided with security for the performance of the assignor's *562 obligations under the lease before the secured party will acquire the equipment subject to the end lease, and (3) the assignor is willing and able to provide such security to the secured party. After this recitation, the collateral lease assignment provides as follows: NOW, THEREFORE, in consideration of the mutual covenants and promises hereinafter set forth, the parties hereto hereby agree as follows: 1. Collateral Assignment. As security for the due and punctual payment and performance by Assignor of all rental and other obligations under the Lease, the Assignor does hereby assign, transfer and set over to Secured Party all of Assignor's right, title and interest in, to and under the collateral specified in Article 2 hereof. 2. Collateral. The property which is subject to the assignment made hereby consists of the following: A. Any and all lease agreements involving the Equipment, including, without limitation, the End Lease, any renewal or extension thereof, and any subsequent lease agreement involving the Equipment (collectively, the "Subleases"); B. All rental or other payments due or to become due from lessees under the Subleases, including late charges, *563 damages, insurance payments, or otherwise; C. The Equipment as now or later described in the schedules in accordance with the provisions of the Lease; D. Any and all collateral or security given for the performance of the obligations under any or all of the Subleases; and E. Any and all proceeds from the Subleases, together with all of the rights and remedies of the Assignor under the Subleases. The agreement further provided that the rights of the secured party to the collateral were subject and subordinate to the rights of prior encumbrances and leaseholds indicated in the attached schedules. Also on May 27, 1981, the Cohens and Tiger as "the agent" entered into a remarketing agreement. This agreement provided that the Cohens, as owners, appointed Tiger as the agent to act as their agent, to sell or lease on their behalf the equipment described on the attached schedule which was the equipment subject to the various purchase agreements and leases upon the expiration or cancelation for any reason of the term of the lease and that the agent accepts the appointment and agrees to exert its best effort to sell or lease the equipment. The agreement provided that the agent *564 shall have the discretion to make all decisions as to the manner in which the equipment shall be offered for sale or lease and the owner shall accept and take all steps necessary to consummate transactions with any purchaser or lessee whose credit worthiness and payment terms are reasonably acceptable to the owner. The agreement further provided that if the agent locate the purchaser who buys the equipment after the expiration of the lease, the agent as compensation for its services, shall be paid an amount equal to the fair market value of such services, which would be paid by a party for similar services in an arm's-length transaction between a willing owner and agent with neither party being under any compulsion to accept the terms and conditions offered by the other. The parties on December 1, 1981, entered into a depository agreement. The parties to this agreement were the Cohens, CTC, Tiger and Manufacturers Hanover Trust Company (Hanover), the depository or the agent. This agreement recited that Tiger is selling to CTC certain equipment and CTC is selling the equipment to the owners (the Cohens) pursuant to a purchase and security agreement and the Cohens are leasing the *565 equipment to Tiger pursuant to the terms of a lease agreement and the Cohens, CTC and Tiger seek to assure the prompt and accurate payment, handling and disbursement of the funds owed by said parties in accordance with the provisions of the various agreements an other instruments by and between the parties and they all desire to use the services of the agent to secure such payment, handling and disbursement of said funds. The depository agreement provided that in consideration of their mutual promises, the Cohens, CTC and Tiger irrevocably appoint the agent as agent for the receipt of payment and the handling of disbursement of funds. The agreement provided (1) that Tiger shall pay each installment of fixed rent, as that term is used in the lease agreement, owed to the Cohens under the lease to the agent in place and stead of the Cohens in accordance with all the terms of the lease, (2) that the agent shall establish accounts for the benefit of the Cohens, CTC and Tiger, (3) that upon the deposit of the rent payment or any portion thereof by Tiger, the agent shall deposit the check of Tiger for the amount paid, credit the account of the Cohens for the amount of the installment of *566 fixed rent paid by Tiger, debit the account of the Cohens for the amount paid by Tiger to the extent that such amount does not exceed the amount of the Cohens' note payment as set forth in column C of the schedule [installment note], credit the account of CTC for the amount debited to the Cohen's account, debit the account of CTC for the amount of their nonrecourse note payable to Tiger to the extent the amount does not exceed the amount of payment made to CTC by the Cohens, credit the account of Tiger for the amount paid to Tiger under the CTC note, and (4) that a statement should be sent to each of the parties each month showing the method of the crediting. The depository agreement could be canceled by Hanover with 90-days' written notice to the Cohens, CTC and Tiger, but could not be canceled by the Cohens, CTC and Tiger, except by the agreement of all three and with 90 days' notice to Hanover. Petitioners on their income tax return for the year 1981 claimed a loss deduction with respect to the computer leasing transaction of $ 450,000 and on their 1982 income tax return claimed a deduction of a loss for the computer leasing transaction of $ 322,952. Respondent in his notice *567 of deficiency disallowed these deductions on the ground that it had not been established that the losses were incurred in a trade or business or with respect to property held for the production of income. Alternatively, respondent determined that the promissory note executed by petitioners is, in fact, a nonrecourse obligation and cannot be included in an amount "at risk" in the equipment for purposes of computing the allowable loss in each year and accordingly the loss from the lease for the years 1981 and 1982 is limited to cash investment in the equipment. Respondent further determined that the underpayment of taxes for the years 1981 and 1982 is a substantial underpayment attributable to a tax motivated transaction under section 6621(d) [now section 6621(c)]. OPINION This case was tried at the same time as the consolidated cases of Young v. Commissioner,T.C. Memo. 1988-440, filed Sept. 15, 1988. Although it was not consolidated with the Young cases, much of the testimony in this case was testimony taken in the consolidated cases. However, much of the testimony in the consolidated cases dealt with the issue of whether the purchase/leaseback transactions *568 of the various taxpayers should be recognized for tax purposes, an issue that respondent has conceded in this case. In Young v. Commissioner, supra, the documents with respect to each transaction were stipulated and in the instant case the documents governing the transaction have been stipulated. The documents stipulated in the instant case, of course, concern the transaction involved in this particular case. As is evident from the findings we have made, the documents here are much the same as the documents involved in Young v. Commissioner, supra, except that in most of the cases involved in the Young case the leaseback to the third-party lessor was by ELMCO, Inc. or CTC which arranged the transaction for the investors and that lease would be assigned along with other assignments by ELMCO, Inc. or CTC to the investors. In the instant case, as was true in a few of the cases involved in Young v. Commissioner, supra, the lease was directly from the Cohens, the investors, to the third-party lessor, in this instance, Tiger. In line with his concession that the transaction here involved is to be properly recognized for tax purposes, *569 respondent concedes that petitioner was at risk for his one-half of the $ 547,500 down payment on the equipment made in cash and equity recourse notes. Respondent contends that petitioner was not at risk on any portion of the $ 2,452,500 installment note. Respondent argues that CTC was inserted between petitioner and Tiger as a straw man merely for the purpose of making it appear that the indebtedness of petitioner was not directly to Tiger. Respondent contends that under section 465(b)(3), Tiger, to which petitioner owed the debt on the equipment, had an interest in the activity other than as a mere creditor because of the reserved sublease income, the leaseback arrangement between Tiger and petitioner and the remarketing agreement. Respondent also argues that under section 465 petitioner was not "at risk" with respect to the installment note since the transaction was structured so that petitioner could never be held personally liable for any portion of this note. Respondent states that the offsetting transactional payments made under the depository agreement when considered in light of the nature of all of the documents and the limitations expressed therein, created a situation *570 which insulated petitioner from any personal liability for any payments on the note. Respondent concludes on the basis of the provisions in these documents that even though the installment note recited that it was in part recourse, in substance, petitioner was not personally liable on any part of the installment note. Section 465(b)(2). Section 465(a) provides that in a transaction involving section 1245 property which is leased, any loss for the taxable year shall be allowed only to the extent that taxpayer is at risk with respect to the activity at the close of the taxable year. Section 465(b) [3] provides that a taxpayer is at risk for the amount of money and his basis in property contributed to an activity, plus borrowed amounts for which he is personally liable or which are secured by property other than the property used in the activity to the extent of the value of the other property. Section 465(b)(3)(A) specifically excludes from "at risk" any amount borrowed from a person who has an interest in the activity other than as a creditor. *571 Because of respondent's concession that the cash amounts and equity note amounts paid by petitioner as a down payment on the computer equipment here involved are amounts "at risk", our issue here concerns the $ 2,452,500 installment note only. That note was in exactly the same amount as the nonrecourse note given by CTC to Tiger in payment for the equipment that CTC purchased from Tiger. The payments were, in amount and timing, identical. The major difference in CTC's note to Tiger and petitioner's note to CTC, was that petitioner's note recited that it was in part recourse. As we pointed out in Melvin v. Commissioner,88 T.C. 63, 75 (1987), in considering whether a person who claims to be personally liable on a note would ultimately be obligated to pay the indebtedness, we must look at the "worst-case scenario." Here, the property was leased to Tiger and subleased by Tiger. Tiger was obligated to pay rent to petitioner and petitioner had assigned this lease and the subleases which were assigned to it by Tiger to CTC as security for its note to CTC. Since the assignment of the lease was only as security, absent any problem, the rent from Tiger was to be paid *572 to petitioner, petitioner was to pay CTC and CTC was to pay Tiger. The parties executed a depository agreement with Hanover as the depository or agent. This depository agreement was executed by petitioner and his brother, Mr. Joel Cohen, CTC and Tiger, with Hanover. It could not be revoked, except by agreement of the Cohens, CTC and Tiger. This agreement provided that instead of paying petitioner and Mr. Joel Cohen, Tiger would pay the money to Hanover. Hanover was then to credit the Cohens' account for the rental amount and credit CTC to the extent of the payment due on the note, which for the first 43 months was the entire rental payment. Hanover was then to credit this same amount back to Tiger, since the payment on CTC's nonrecourse note to Tiger was the same as the payment on the Cohens'' note to CTC. In effect, it would have been unnecessary for Tiger to make any payment at all and just have transfers made on books. Of course, Tiger was indebted to the ban on a note with which it had purchased the equipment from the manufacturer. This note of Tiger to the bank was a nonrecourse note. So, effectively, to keep the equipment, Tiger had to pay the bank the amount due on *573 its note to the bank. Since the sublessees paid Tiger, the rental payments by the sublessees were undoubtedly used by Tiger to the extent necessary to pay its indebtedness to the bank upon the crediting of its account by Hanover. Since the rental payment which originated from Tiger was credited on the Cohens' notes to CTC and again credited from CTC back to Tiger, realistically Tiger probably used the payments from the sublessees to the extent necessary to pay the bank. In the "worst-case scenario" here, if Tiger failed to make a payment, the failure would be of no consequence unless it failed to pay its note to the bank. If Tiger failed to pay the bank, the bank would be entitled to distrain on the equipment pursuant to its senior lien since the equipment was pledged to the bank for payment of Tiger's purchase money indebtedness to it. The bank's lien was the first lien on the equipment. If the sublessees, the major one of which was AT&T, had ceased to pay Tiger, because of the various assignments among the parties of the sublessees as guarantee for payment of indebtednesses, the bank could have obtained the sublessees; payments if Tiger had not made its payments to the bank. *574 The remote "worst-case scenario" here would be (1) that the sublessees ceased paying Tiger, (2) Tiger did not enforce payment from them, substitute another sublessee for the equipment, or pay the bank from its own funds, (3) the bank was unable to collect from Tiger or the sublessees because of their inability to pay their debts or their bankruptcies, and (4) the bank distrained on and sold the equipment. Even under the "worst-case scenario," Tiger could still discharge its obligations for rental payments to the extent of petitioner's and CTC's notes merely by crediting its rent through the Cohens over to CTC and back to itself. Since the circle was immediately completed "from Tiger back to Tiger," under no circumstances would this circular crediting have been required to cease. Even more importantly, if the rental payments ceased and the equipment was taken, CTC's note would in effect be discharged since it was a nonrecourse note which was guaranteed with a lien subordinate to the bank's lien. Under these circumstances, CTC would owe no indebtedness to Tiger, or if under the form of the setup it did, Tiger had the same indebtedness to it via its required lease payments to the *575 Cohens, which the Cohens had assigned to CTC as security for payment on the installment note. In the purchase agreement, CTC had indemnified the Cohens from loss from any breach of the purchase agreement. If the equipment sold by CTC to the Cohens was distrained upon so that it could not be available to the Cohens upon expiration of the lease, CTC would certainly not collect on a note to it when it was not paying its note to Tiger without violating its indemnity agreement. We have recited above how in our view even under the "worst-case scenario", the documents as they existed left no possibility of petitioner ever being required to pay any portion of their installment note to CTC other than through Tiger's rental payments. We have concluded that petitioner was "effectively immunized from any realistic possibility of suffering an economic loss" other than the down payment. See Porreca v. Commissioner,86 T.C. 821, 838 (1986). Also, in this case as in Young v. Commissioner, supra, we agree with respondent that CTC played no useful role in the transaction between Tiger and petitioner, but was merely a straw man. In this case as in the Young *576 case, we agree with respondent that CTC's place in the transactions as framed was merely an attempt to make installment notes on which petitioner was not personally liable, appear to comply with the "at risk" provisions of section 465. The substance of the transactions here, as in Young v. Commissioner, supra, was that petitioner and Mr. Joel Cohen had in effect merely assumed CTC's nonrecourse liability to Tiger. Considering all of the documents as a whole, we conclude for the same reasons stated in Young v. Commissioner, supra, that petitioner's liability on the installment notes was not a personal liability in substance, and therefore, petitioner was not "at risk" under section 465 with respect to any portion of the installment note. We therefore hold that petitioner is entitled to the losses he incurred from the computer leasing transaction in 1981 and 1982 only to the extent of his one-half interest in the $ 547,500 down payment composed of cash payment and recourse equity notes. The only other issue is whether petitioner is liable for additional interest under section 6621(c)[4] [previously designated section 6621(d) of the Internal Revenue Code *577 of 1954]. This section provides for an increased rate of interest of 120-percent of the underpayment rate on any substantial underpayment which is attributable to tax-motivated transactions. The provisions of the section are applicable for interest accruing after December 31, 1984. "A substantial underpayment" is defined in section 6621(c)(2) as an underpayment greater than $ 1,000. A tax-motivated transaction is defined in section 6621(c)(3) to include a loss disallowed by reason of section 465(a). Since we have concluded that part of petitioner's underpayment is attributable to his losses which are disallowed as a result of section 465, the provisions of section 6621(c) are applicable here to the extent that the losses with respect to the purchase/leaseback transaction create an underpayment in either of the years here in issue in excess of $ 1,000. *578 Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue. Subsection (d) of section 6621↩ was redesignated subsection (c) and amended by the Tax Reform Act of 1986, section 1511(c)(1)(A)-(C), Public Law 99-514, 100 Stat. 2744.
2. The issue of whether petitioners purchase/leaseback should be recognized for tax purposes, was presented by the parties at trial, as was the issue of whether all the notes executed by petitioners are includable in their base of the computer equipment for purposes of depreciation. However, on brief respondent conceded these issues.↩
3. Section 465(b) stated in pertinent part as follows: (b) Amounts Considered At Risk. -- (1) In General. -- For purposes of this section, a taxpayer shall be considered at risk for an activity with respect to amounts including -- (A) the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, and (B) amounts borrowed with respect to such activity (as determined under paragraph (2)). (2) Borrowed Amounts. -- For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he -- (A) is personally liable for the repayment of such amounts, or (B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property). No property shall be taken into account as security if such property is directly or indirectly financed by indebtedness which is secured by property described in paragraph (1). (3) Certain Borrowed Amounts Excluded. -- For purposes of paragraph (1)(B), amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who -- (A) has an interest (other than an interest as a creditor) in such activity, or (B) has a relationship to the taxpayer specified within any one of the paragraphs of section 267(b). (4) Exception. -- Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.↩
4. Section 6621(c) reads as follows: (c) INTEREST ON SUBSTANTIAL UNDERPAYMENTS ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS. -- (1) IN GENERAL. -- In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the underpayment rate established under this subsection. (2) SUBSTANTIAL UNDERPAYMENT ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS. -- For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $ 1,000. (3) TAX MOTIVATED TRANSACTIONS. -- (A) IN GENERAL. -- For purposes of this subsection, the term "tax motivated transaction" means -- (i) any valuation overstatement (within the meaning of section 6659(c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), and (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and (v) any sham or fraudulent transaction. ↩